Nathan Matthews, CA Bar No. 264248
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
Phone: (415) 977-5695
Fax: (510) 208-3140
nathan.matthews@sierraclub.org

*Counsel for Plaintiff Sierra Club*
*(Additional Counsel Listed on Signature Page)*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SIERRA CLUB; CENTER FOR BIOLOGICAL DIVERSITY; DINÉ CITIZENS AGAINST RUINING OUR ENVIRONMENT; EARTHWORKS; FORT BERTHOLD PROTECTORS OF WATER AND EARTH RIGHTS; SOUTHERN UTAH WILDERNESS ALLIANCE, THE WILDERNESS SOCIETY; and WESTERN RESOURCE ADVOCATES, <br><br> Plaintiffs, <br><br> v. <br><br> RYAN ZINKE, in his official capacity as Secretary of the Interior; UNITED STATES BUREAU OF LAND MANAGEMENT; and UNITED STATES DEPARTMENT OF THE INTERIOR, <br><br> Defendants. | Case No. 3:18-cv-00524 <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br> (Administrative Procedure Act, 5 U.S.C. § 551, *et seq.*) |

**INTRODUCTION**

1.      This case challenges the U.S. Bureau of Land Management's (BLM) repeal of a 2015 regulation that provided new protections for oil and gas development on public and tribal lands.  82 Fed. Reg. 61,924 (Dec. 29, 2017) (the Repeal).  The Repeal leaves more than 700 million acres (about 1.1 million square miles) of lands and minerals managed by the BLM subject to outdated standards that fail to protect groundwater, lands, and wildlife.  In doing so, the Repeal violates the Federal Land Policy and Management Act (FLPMA), the Mineral Leasing Act (MLA), the Indian Mineral Leasing Act (IMLA), and the National Environmental Policy Act (NEPA), and is arbitrary and capricious.

2.      The regulation BLM has repealed (the Hydraulic Fracturing Rule or 2015 Rule) was issued in 2015 following an extensive five-year rulemaking process.  80 Fed. Reg. 16,128 (Mar. 26, 2015).  The agency's previous oil and gas regulations had been developed in the 1980s, long before modern hydraulic fracturing practices came into common use.  As part of developing the 2015 Rule, BLM reviewed those 30-year-old regulations and the patchwork of existing state and tribal laws, considered recommendations from numerous experts, other agencies, states and native American tribes, and accepted two rounds of public comment in which it received more than one million comments.  BLM concluded that its prior regulations were inadequate to address the risks posed to federal and tribal lands by current oil and gas development technologies.

3.      To meet its statutory obligations to protect those lands, BLM developed an updated regulation that modernized well construction and waste management standards, required greater BLM oversight of hydraulic fracturing operations, and mandated disclosure of the chemicals used in those operations.  The compliance costs for these additional protections were very modest: they amounted to only 0.1% to 0.2% of the cost of drilling each well, which BLM recognized was too insignificant to discourage energy development on federal and tribal lands.

4.      Unfortunately, the Hydraulic Fracturing Rule's benefits were never realized.  Several oil and gas industry trade associations opposed the additional oversight and environmental protections required by the 2015 Rule.  Those associations, along with several states, challenged the

2015 Rule in federal court, and district court orders in that litigation prevented the 2015 Rule from taking effect.

5.    While an appeal was pending, a new presidential administration took office.  In March 2017 President Donald J. Trump and Secretary of the Interior Ryan Zinke ordered BLM to rescind the 2015 Rule.  Following these instructions, BLM proceeded to propose and then finalize a repeal of the Hydraulic Fracturing Rule.  In contrast to the nearly five-year process of developing the 2015 Rule, BLM completed notice-and-comment rulemaking on its repeal in just over five months.  *See* 82 Fed. Reg. 34,464 (July 25, 2017) (proposed repeal); 82 Fed. Reg. 61,924 (Dec. 29, 2017) (final repeal).  The Repeal leaves oil and gas development on federal and tribal lands subject to BLM's outdated 1980s-era regulations.

6.    The new administration justified its elimination of the 2015 Rule as an effort to "Promot[e] Energy Independence and Economic Growth."  Executive Order No. 13,783, 82 Fed. Reg. 16,093 (Mar. 28, 2017); 82 Fed. Reg. at 61,925, 61,937–38 (citing Executive Order 13,783).  BLM's own analysis, however, refutes the claim that the Repeal will promote additional energy development.  BLM found that repealing the Hydraulic Fracturing Rule would result in absolutely no increase in fracturing operations on federal and tribal lands.  Instead, the Repeal will spare companies very modest compliance costs while excusing them from additional oversight that BLM determined was necessary to ensure protection of public and tribal lands.  BLM's other explanations for rescinding the 2015 Rule also conflict with the facts.  For example, while the agency asserts that the 2015 Rule is "duplicative" of state and tribal regulations, its own assessment identifies a variety of protections afforded by the 2015 Rule that are not provided by many state or tribal laws.

7.    The Repeal also fails to comply with BLM's obligations under FLPMA, the MLA, the IMLA, and other statutes.  Those laws charge BLM with managing and protecting federally-owned lands, and acting as trustee for Indian lands.  BLM recognized in 2015 that the requirements of the Hydraulic Fracturing Rule were necessary to satisfy those statutory responsibilities, and that neither its 30-year-old regulations, nor a patchwork of state and tribal laws, could substitute for an adequate level of federal environmental protections.  In rescinding the 2015 Rule, BLM asserted that relying on state and tribal regulation provides a "better framework" for "mitigating the impacts" of

oil and gas operations, 82 Fed. Reg. at 61,939, but never reconciled this new approach with the agency's statutory obligations to protect those lands.

8.     BLM also failed to prepare an Environmental Impact Statement (EIS) analyzing the reasonably foreseeable impacts of the Repeal.  Instead, the agency asserted that its repeal of national standards will have no significant impact on the environment despite affecting thousands of new oil and gas wells each year, and hundreds of millions of acres of public and tribal lands.  This conclusion was arbitrary and capricious and violated NEPA.

9.     Plaintiffs therefore respectfully seek a declaration that the Repeal violates FLPMA, the MLA, IMLA, and NEPA and is arbitrary, capricious, contrary to law, and in excess of BLM's authority.  Plaintiffs also seek an order setting aside the Repeal.

**JURISDICTION AND VENUE**

10.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 5 U.S.C. § 702 (Administrative Procedure Act (APA)).

11.     An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. § 706.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant BLM maintains offices in this district.  BLM administers 15 million acres of public lands, more than 49 million acres of subsurface mineral estate, and nearly 600,000 acres of Native American tribal mineral estate in California.  At the end of fiscal year 2016, BLM administered 530 oil and gas leases in California, covering around 200,000 acres and containing around 6,800 oil and gas wells. BLM specifically manages public oil and gas resources in this district that are subject to the Repeal. In 2016, California operators developed more than 11 million barrels of federal oil and 12 billion cubic feet of federal natural gas.

13.     Venue also is proper in this district because Plaintiffs Sierra Club and Center for Biological Diversity are nonprofit corporations in good standing incorporated in the State of California.  Plaintiff Sierra Club is headquartered in Oakland, and Plaintiffs Center for Biological Diversity and Earthworks have offices in Oakland.  Additionally, Plaintiff The Wilderness Society

maintains an office in this district.  Plaintiffs collectively have more than 295,000 members living in California.  This includes more than 79,000 members residing in the Northern District.

## INTRADISTRICT ASSIGNMENT

14.     Pursuant to Civil Local Rules 3-5(b) and 3-2(c), there is no basis for assignment of this action to any particular location or division of this Court.  However, this case is related to Case No. 3:18-cv-00521, which is currently pending in the San Francisco Division.  Case No. 3:18-cv-00521, filed by the State of California, also challenges the Repeal.  The legal claims in that case are very similar to the legal claims in this case.  Pursuant to Civil Local Rule 3-12(b), Plaintiffs intend to promptly file an Administrative Motion to Consider Whether Cases Should Be Related.

## PARTIES

15.     Plaintiff SIERRA CLUB, founded in 1892, is the nation's oldest and largest grassroots environmental organization.  Sierra Club is incorporated and headquartered in California, with a principal place of business at 2101 Webster St., Suite 1300, Oakland, CA 94612.  Sierra Club has about 250 employees who work in California, including about 200 employees who work at its headquarters in Oakland.  Sierra Club California has thirteen local chapters, including five chapters in northern California that collectively have about 96,600 members:  the Loma Prieta, Mother Lode, Redwood, San Francisco Bay, and Ventana Chapters.  Sierra Club currently has more than 830,000 members nationwide, including more than 182,000 in California.  More than 71,000 of these members reside in the Northern District of California.  Sierra Club's mission is to explore, enjoy, and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems and resources; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives.  In addition to helping people from all backgrounds explore nature and our outdoor heritage, Sierra Club works to promote clean energy, safeguard the health of our communities, protect wildlife, and preserve our remaining wild places through grassroots activism, public education, lobbying, and legal action.  Sierra Club pursues these objectives nationwide, including in California.  For example, Sierra Club has been actively involved in raising awareness about the public health consequences of hydraulic fracturing on public lands, including in northern California.  Sierra Club sued BLM for

1  failing to consider the impacts of hydraulic fracturing before leasing public lands in Monterey

2  County for oil and gas development.  *Ctr. for Biological Diversity v. BLM*, 937 F. Supp. 2d 1140

3  (N.D. Cal. 2013).  In April 2017, Sierra Club submitted comments on BLM's Draft Resource

4  Management Plan Amendment/Environmental Impact Statement for oil and gas leasing and

5  development within the Central Coast Field Office.  The Central Coast Field Office includes all or

6  part of several counties within the Northern District of California:  Alameda, Contra Costa,

7  Monterey, San Benito, San Francisco, San Mateo, Santa Clara, and Santa Cruz.

8       16.    Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (the Center) is a nonprofit

9  organization incorporated in the State of California that works through science, law, and policy to

10  secure a future for all species, great or small, hovering on the brink of extinction.  The Center has

11  offices throughout the country, including an office in Oakland, California.  The Center has over

12  58,500 members, including more than 13,000 in California, and more than 1.3 million online

13  supporters worldwide.  Specifically, the Center has more than 4,000 members residing in the

14  Northern District of California.  The Center's members use BLM-managed public lands for

15  recreational, scientific, educational, and other pursuits and intend to continue to do so in the future,

16  and are particularly interested in protecting the many native, imperiled, and sensitive species and

17  their habitats that may be affected by oil and gas leasing and development.  Although the Center

18  pursues its objectives of protecting threatened and endangered species and their habitats nationwide,

19  the Center specifically works to protect public lands administered by BLM in the Northern District

20  of California from the harmful impacts of oil and gas development, including hydraulic fracturing.

21  The Center researches, documents, and raises awareness of the environmental consequences of oil

22  and gas development and hydraulic fracturing in California.  This campaign includes, among other

23  efforts, publishing reports on aquifer contamination and seismic risks from oil and gas activities,

24  rallying local governments, including Monterey County, to prohibit hydraulic fracturing, and

25  litigating BLM's oil and gas leasing activities on California public lands.  Like Sierra Club, the

26  Center was a plaintiff in a 2011 lawsuit challenging BLM's failure to consider the impacts of

27  hydraulic fracturing in the Northern District of California.  *Ctr. for Biological Diversity v. BLM*, 937

28  F. Supp. 2d 1140 (N.D. Cal. 2013).

17.     Plaintiff DINÉ CITIZENS AGAINST RUINING OUR ENVIRONMENT (Diné C.A.R.E.) is an all-Navajo organization comprised of a federation of grassroots community activists in Arizona, New Mexico and Utah who strive to educate and advocate for traditional teachings derived from Diné Fundamental Laws.  Diné C.A.R.E.'s goal is to protect all life in their ancestral homeland by empowering local and traditional people to organize, speak out, and determine the outlook of the environment through civic involvement and engagement in decision-making processes relating to tribal development, including oil and gas development on public and tribal lands in the San Juan Basin of New Mexico.

18.     Plaintiff EARTHWORKS is a membership-based 501(c)(3) nonprofit organization dedicated to protecting communities and the environment from the adverse impacts of mineral and energy development while promoting sustainable solutions.  Earthworks was created in 2005, when two organizations (the Mineral Policy Center and the Oil & Gas Accountability Project) joined forces.  Earthworks collaborates with communities and grassroots groups to reform government policies to better protect air, water, public lands and communities from threats posed by mineral development.  Earthworks has an office in California where three staff, including its Executive Director, work.  Earthworks has more than 70,000 members nationwide, including over 9,200 members in California.  Among Earthworks' members, approximately 4,200 live in the Northern District of California.

19.     Plaintiff FORT BERTHOLD PROTECTORS OF WATER AND EARTH RIGHTS (Fort Berthold POWER) is a grassroots, member-led community group that works to promote responsible energy development in and around the Fort Berthold Indian Reservation in North Dakota.  Fort Berthold POWER is committed to working toward a sustainable society with an awareness for all life.  The mission of Fort Berthold POWER is to conserve and protect the land, water, and air on which all life depends.  Fort Berthold POWER works to engage citizens in activities that protect the environment, facilitates learning for members to disseminate information on environmental issues that affect all people, and expands members' ability to take effective action to address issues that affect land, air, and water.

20.     Plaintiff SOUTHERN UTAH WILDERNESS ALLIANCE (SUWA) is a non-profit environmental membership organization with members in all fifty states.  SUWA's mission is the preservation of the outstanding wilderness and other sensitive public lands at the heart of the Colorado Plateau, and the management of these lands in their natural state for the benefit of all Americans.  SUWA promotes local and national recognition of the region's unique character through research and public education; supports both administrative and legislative initiatives to permanently protect Utah's wild places; builds support for such initiatives on both the local and national level; and provides leadership within the conservation movement through uncompromising advocacy for wilderness preservation.  SUWA has worked extensively and tirelessly to protect the clear air and water of the Colorado and Green river drainages in Utah as well as the wildlife and vegetation of that area.  SUWA actively participates in all levels of the BLM's decision-making process.  SUWA has taken an active role in providing critical information to the BLM regarding the agency's day-to-day management activities, including oil and gas exploration and development.  SUWA's members and staff enjoy recreation, sightseeing, bird-watching, photography, and other activities on the BLM-managed public lands affected by BLM rescinding the Hydraulic Fracturing Rule, including lands in the Uinta Basin.

21.     Plaintiff THE WILDERNESS SOCIETY (TWS) has a mission to protect wilderness and inspire Americans to care for our wild places.  TWS has offices throughout the country, including offices in San Francisco and Pasadena, California, and a California Desert representative. TWS has more than 1,000,000 members and supporters around the West, including more than 91,000 in California.  TWS has a long-standing interest in the management of public lands across the nation, and engages frequently in land use planning and project proposals that could potentially affect wilderness quality lands, wildlife habitat, and other natural resources, as well as the health, safety and quality of life of surrounding communities.  TWS also has a long-standing interest in the use of our public and tribal lands for energy development, including supporting a transition to renewable energy, and ensuring that oil and gas and other energy development are focused in suitable locations and completed in a manner that does not harm other values.  TWS has been actively involved in planning, policy, and conservation efforts in California, including the Northwest

California Integrated Resource Management Plan for BLM lands in Humboldt, Mendocino, Del Norte, Trinity, Shasta, Siskiyou, Butte, and Tehama Counties. TWS also focuses on protecting the Cascade-Siskiyou National Monument, the San Gabriel Mountains, Sierra Nevada, the California Desert, and the Central Coast.

22. Plaintiff WESTERN RESOURCE ADVOCATES (WRA) is a nonprofit organization dedicated to protecting the West's land, air, and water to ensure that vibrant communities exist in balance with nature. WRA uses law, science, and economics to craft innovative solutions to the most pressing conservation issues in the region, and advocate for policies that advance its mission on behalf of its members. WRA works to guarantee that the West will have clean air and clean water to support healthy communities and vital habitat. As part of this work, WRA participates in regulatory rulemaking processes on issues that impact the West's land, air, and water, and that are of concern to its members. This includes rules regarding oil and gas development, in particular on public lands. Many WRA members live near and recreate on public lands close to existing and/or proposed oil and gas development.

23. Plaintiffs bring this action on behalf of themselves and their adversely affected members. For many years, Plaintiffs and their members have actively advocated for strong BLM standards to reduce the risks of oil and gas development on public and tribal lands, and have devoted significant resources toward that effort. For example, Plaintiffs and their members submitted comments on each version of the proposed Hydraulic Fracturing Rule. Plaintiffs' members attended public meetings and hearings and tribal consultation sessions. Several plaintiffs also intervened to defend the Hydraulic Fracturing Rule from a lawsuit filed by several states and industry groups. Finally, Plaintiffs and their members submitted comments on BLM's proposed Repeal.

24. Many of Plaintiffs' members live, work, and recreate in and around, and otherwise use and enjoy, federal and tribal lands where hydraulic fracturing is occurring or has been proposed and will be affected by pollution and other impacts from such operations. For example, some members live on or near split estate lands (where the federal government owns the minerals underlying non-federal surface) and tribal lands where hydraulically-fractured oil and gas development is already occurring or likely to occur in the future. Other members recreate on or near

1    lands that have been leased by the federal government for oil and gas development.  These members

2    will be adversely affected by the Repeal.  By rescinding the Hydraulic Fracturing Rule, BLM

3    deprives Plaintiffs' members of protections from water pollution that otherwise would have

4    benefitted them, subjects them to adverse health risks, and reduces their enjoyment of wildlife and

5    the lands where they live and recreate.

6        25.    Defendant RYAN ZINKE is the Secretary of the Interior.  Plaintiffs sue Secretary

7    Zinke in his official capacity.  Secretary Zinke oversees oil and gas development on federal and

8    tribal lands, and is ultimately responsible for the Repeal.  Secretary Zinke has a trust responsibility to

9    tribes and individual Indian mineral owners.

10       26.    Defendant BUREAU OF LAND MANAGEMENT is an agency of the United States

11   within the Department of the Interior.  BLM is responsible for managing publicly-owned lands and

12   minerals in accordance with federal law.  BLM promulgated the Hydraulic Fracturing Rule, and later

13   promulgated the Repeal.

14       27.    Defendant U.S. DEPARTMENT OF THE INTERIOR (the Interior Department) is an

15   executive branch department that is the parent agency of BLM, and is thus ultimately responsible for

16   the Repeal.

17                              **LEGAL FRAMEWORK**

18   **I.    Administrative Procedure Act, 5 U.S.C. § 551** *et seq.*

19       28.    The APA authorizes judicial review of agency actions and provides that courts "shall

20   . . . hold unlawful and set aside agency action, findings, and conclusions found to be[] arbitrary,

21   capricious, an abuse of discretion, or otherwise not in accordance with law . . . in excess of statutory

22   jurisdiction, authority, or limitations, or short of statutory right; . . . [or] without observance of

23   procedure required by law."  5 U.S.C. § 706(2)(A), (C), (D).

24       29.    An agency acts arbitrarily and capriciously when it provides "an explanation for its

25   decision that runs counter to the evidence before the agency."  *Motor Vehicle Mfrs. Ass'n of U.S.,*

26   *Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

27       30.    When an agency changes positions, the APA requires it to (a) "display awareness that

28   it *is* changing position;" (b) show that the new policy is permissible under governing statutes; (c)

1   explain why the agency believes the new policy is better than the old one; and (d) "show that there

2   are good reasons for the new policy," which requires a more detailed explanation where the "new

3   policy rests upon factual findings that contradict those which underlay its prior policy; or when its

4   prior policy has engendered serious reliance interests that must be taken into account." *Fed.*

5   *Commc'ns Com'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009) (*FCC v. Fox*)

6   (emphasis in original).

7       31.     As to the fourth factor, "unexplained conflicting findings about the environmental

8   impacts of a proposed agency action violate the APA."  *Organized Vill. of Kake v. U.S. Dep't of*

9   *Agric.*, 795 F.3d 956, 969 (9th Cir. 2015) (en banc).

10      32.     The APA's standard of reasoned decisionmaking further requires agencies to consider

11  both the advantages and disadvantages—in other words, both the costs and benefits—of their

12  decisions.  *Michigan v. Envtl. Prot. Agency*, 135 S. Ct. 2699, 2707 (2015).

13  **II.    Federal Land Policy and Management Act, 43 U.S.C. § 1701 *et seq.***

14      33.     FLPMA directs BLM to manage the public lands "in a manner that will protect the

15  quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water

16  resource, and archeological values; that, where appropriate, will preserve and protect certain public

17  lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic

18  animals; and that will provide for outdoor recreation and human occupancy and use."  43 U.S.C.

19  § 1701(a)(8).

20      34.     FLPMA requires that "[t]he Secretary [of the Interior] shall manage the public lands

21  under principles of multiple use and sustained yield."  *Id.* § 1732(a).  "Multiple use" is defined as

22  "management of the public lands . . . that takes into account the long-term needs of future

23  generations for renewable and nonrenewable resources, including, but not limited to, recreation . . .

24  minerals . . . and natural scenic, scientific and historical values; and harmonious and coordinated

25  management of the various resources without permanent impairment of the productivity of the land

26  and the quality of the environment with consideration being given to the relative values of the

27  resources and not necessarily to the combination of uses that will give the greatest economic return

28  or the greatest unit output."  *Id.* § 1702(c).

35.    FLPMA also requires BLM "to establish comprehensive rules and regulations" to administer public lands. *Id.* § 1701(a)(5).  It directs that the Secretary of the Interior "shall issue regulations necessary to implement the provisions of this Act with respect to the management, use, and protection of the public lands." *Id.* § 1733(a).  And it provides that the Secretary "shall promulgate rules and regulations to carry out the purposes of this Act and of other laws applicable to the public lands." *Id.* § 1740.

36.    FLPMA specifically mandates that BLM "shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the [public] lands." *Id.* § 1732(b).

## III.    The Mineral Leasing Act, 30 U.S.C. § 181 *et seq.*

37.    Congress adopted the MLA in 1920 to substantially expand federal control over mineral development on public lands, and to ensure that the Interior Department would manage that activity in the public interest.  The Supreme Court has described the MLA's purpose as "conservation through control."  *Boesche v. Udall*, 373 U.S. 472, 481 (1963).

38.    The Secretary of the Interior is directed to "prescribe necessary and proper rules and regulations and to do any and all things necessary to carry out and accomplish the purposes of [the MLA]."  30 U.S.C. § 189.  Those purposes include ensuring "the exercise of reasonable diligence, skill, and care" by companies operating on federal lands, preventing waste, "protection of the interests of the United States," and "safeguarding of the public welfare."  *Id.* § 187.

39.    The MLA also directs that the Interior Department "shall regulate all surface-disturbing activities conducted pursuant to any lease issued under this chapter, and shall determine reclamation and other actions as required in the interest of conservation of surface resources." *Id.* § 226(g).

## IV.    The Indian Mineral Leasing Act, 25 U.S.C. § 396a *et seq.*

40.    BLM regulates tribal minerals pursuant to the IMLA, which provides that "[a]ll operations under any oil, gas, or other mineral lease" issued pursuant to the IMLA or other related statutes "shall be subject to the rules and regulations promulgated by the Secretary of the Interior." 25 U.S.C. § 396d.

41.   The IMLA confers a trust responsibility on the Secretary of the Interior to "manage and regulate Indian mineral interests . . . for the benefit of the Indian landowners." *Woods Petroleum Corp. v. Dep't of the Interior*, 47 F.3d 1032, 1038 (10th Cir. 1995) (en banc).

**V.   National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.***

42.   NEPA "is 'our basic national charter for protection of the environment.'" *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1177 (9th Cir. 2011) (quoting 40 C.F.R. § 1500.1(a)).  It serves two goals:  (a) fostering informed decision-making by federal agencies, and (b) promoting informed public participation in government decisions.  *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 97 (1983).  To meet those goals, NEPA requires that agencies "consider every significant aspect of the environmental impact of a proposed action," *id.* (quotation omitted), and inform the public of the environmental impacts of agency proposals, *Kern v. BLM*, 284 F.3d 1062, 1066 (9th Cir. 2002).

43.   Prior to undertaking any "major Federal action[] significantly affecting the quality of the human environment," NEPA requires federal agencies to provide a "detailed statement" explaining "the environmental impact of the proposed action."  42 U.S.C. § 4332(2)(C)(i).

44.   Agencies must prepare an EIS if there are "substantial questions whether a project may have a significant effect on the environment." *Anderson v. Evans*, 371 F.3d 475, 488 (9th Cir. 2004) (quotation omitted).

45.   To determine if preparing an EIS is necessary, Council on Environmental Quality (CEQ) regulations implementing NEPA allow agencies to prepare an environmental assessment (EA) with "sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact" (FONSI).  40 C.F.R. § 1508.9.  Department of the Interior regulations include a similar requirement.  *See* 43 C.F.R. § 46.300.

46.   Relevant factors in determining whether an EIS is necessary include "considerations of both context and intensity."  40 C.F.R. § 1508.27.

47.   Context requires an analysis of impacts at a variety of scales, including national, regional, and local, over both the long and short term.  *Id.* § 1508.27(a).

48.     CEQ has developed a list of ten factors that agencies should consider in determining whether an action has sufficient intensity to be considered significant.  *See id.* § 1508.27(b).  The presence of any "one of these factors may be sufficient to require preparation of an EIS in appropriate circumstances."  *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2005).  Factors include, for example, "[t]he degree to which the proposed action affects public health or safety," "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial," "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks," "[t]he degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration," "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts," "[t]he degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act," and "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment."  40 C.F.R. § 1508.27(b)(2), (4), (5), (6), (7), (9), (10).

49.     An agency's NEPA analysis must identify the direct, indirect, and cumulative impacts of its proposed action.  *Id.* §§ 1502.16(a), (b), 1508.7, 1508.8, 1508.25(c).  In doing so agencies must disclose, analyze, and take a hard look at the "the environmental impacts of the proposed action and alternatives."  *Id.* § 1508.9(b).  "The purpose of NEPA is to require disclosure of relevant environmental considerations that were given a 'hard look' by the agency."  *Lands Council v. Powell*, 395 F.3d 1019, 1027 (9th Cir. 2005).  An agency's analysis must consider "all foreseeable direct and indirect impacts and "should involve a discussion of adverse impacts that does not improperly minimize negative side effects."  *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 975 (9th Cir. 2006).

1

## FACTUAL BACKGROUND

2

**I.      The Interior Department's Historic Regulations Are Inadequate to Address Modern Oil**
3          **and Gas Development.**

4          50.     Since passage of the MLA nearly a century ago, Congress has charged the Interior

5    Department with managing oil and gas development on federal lands, and with protecting those

6    lands.  Pursuant to Congressional mandates under the MLA and FLPMA, Interior Department

7    regulations have for many decades imposed "exacting restrictions and continuing supervision" over

8    oil and gas development on public lands, and "govern[ed] in minute detail all facets of the working

9    of the land."  *Boesche*, 373 U.S. at 477–78 (citing MLA, 30 U.S.C. § 189).

10         51.     For example, Interior Department regulations from the 1920s required agency staff to

11   inspect and supervise oil and gas operations on federal lands, and to require operators to correct

12   conditions that might damage groundwater formations.  By the 1930s, Interior Department

13   regulations addressed well construction and testing, disposal of salt water and other drilling wastes,

14   required agency approval of post-drilling activities, and required operators to submit information to

15   regulators.  The Interior Department's 1936 regulations also required agency approval for

16   stimulating oil and gas production by water injection or "shooting" a well (a precursor to hydraulic

17   fracturing that used explosives in the well to stimulate production).

18         52.     BLM's current regulations were issued in the 1980s.  In 1982, the Interior

19   Department issued regulations covering a number of issues, including some very limited provisions

20   applying to hydraulic fracturing operations.  47 Fed. Reg. 47,758, 47,770 (Oct. 27, 1982).  In 1988,

21   BLM supplemented those regulations with Onshore Order No. 2, which provided limited well

22   construction and testing requirements.  53 Fed. Reg. 46,798, 46,800–02 (Nov. 18, 1988).  In contrast

23   to the agency's 1936 regulations requiring prior approval for "shooting" a well, the 1980s BLM

24   regulations required no prior approval for "routine" hydraulic fracturing operations.  42 Fed. Reg. at

25   47,770 (adopting 30 C.F.R. § 221.27 (1982)).  In practice, companies treated nearly all fracturing

26   operations as routine and did not obtain prior BLM approval.  *See* 82 Fed. Reg. at 61,926.

27

28

53.     By 2010, oil and gas operations had changed substantially from the 1980s.  BLM recognized that its existing regulatory regime was inadequate to address new environmental and safety hazards presented by those changes, particularly the growth of modern hydraulic fracturing.

54.     Hydraulic fracturing, also known as "fracking," is a technique in which water, chemicals, and sand are injected through an oil and gas well into geologic formations under high pressures to fracture the rock and thereby release oil and gas.  While such techniques have existed for decades, their intensity, scale, and complexity have increased dramatically in recent years.  In particular, companies today have combined hydraulic fracturing with advanced horizontal drilling technologies to construct wellbores that are nearly three miles long and where fracturing uses millions of gallons of water per well.

55.     In addition to dramatically larger operations, hydraulic fracturing has become much more common, driving a rapid expansion of oil and gas development across the country.  80 Fed. Reg. at 16,131.  Today, over 90% of oil and gas wells on public and tribal lands are hydraulically fractured.  The hydraulic fracturing boom has been accompanied by well-documented incidents of groundwater contamination and other accidents resulting from inadequately constructed wells, leaks from pits storing hydraulic fracturing wastes, and problems resulting from secrecy about the chemicals used in hydraulic fracturing.  BLM staff in New Mexico even reported that they did not inspect fracturing operations in person because the "pressures are too high and the work is too dangerous."

**II.     BLM Develops the Hydraulic Fracturing Rule to Fulfill Its Statutory Obligations.**

56.     Numerous experts, federal agencies, Congress and individual legislators, tribes, and the public urged BLM to update its outdated regulations to address the threats presented by hydraulic fracturing.  Beginning in 2010, BLM undertook an extensive, nearly five-year-long public process to modernize its regulations.

57.     BLM's public process started with a November 2010 public forum in Washington, D.C.  BLM subsequently held public forums in April 2011 in Bismarck, North Dakota, Little Rock, Arkansas, and Golden, Colorado.  These forums were attended by more than 600 members of the public.  BLM also invited tribal entities to a series of consultation meetings held in January 2012 in

1    Tulsa, Oklahoma, Billings, Montana, Salt Lake City, Utah, and Farmington, New Mexico.  A total of

2    27 tribes were represented at these hearings.

3         58.    BLM proposed a hydraulic fracturing rule in May 2012.  Because of the high level of

4    public interest, BLM extended the comment period by 60 days.  And BLM held additional tribal

5    consultation sessions in Lincoln, Nebraska, and New Town, North Dakota.  BLM received over

6    177,000 comments on the proposed rule.

7         59.    Based on the public comments it received, BLM sought additional public input by

8    issuing a supplemental notice of proposed rulemaking in May 2013.  BLM once again extended the

9    comment period by 60 days.  BLM received 1.3 million public comments in response to the

10   supplemental notice of proposed rulemaking.

11        60.    BLM finalized the Hydraulic Fracturing Rule on March 26, 2015, after working for a

12   year and a half to consider the public comments and further refine the rule.

13        61.    BLM concluded that its existing regulations were inadequate to protect the

14   environment and public health and safety from the risks posed by modern oil and gas development,

15   and to meet its legal duties for protecting public and Indian lands.  BLM explained that its existing

16   "regulations were established in 1982 and last revised in 1988, long before the latest hydraulic

17   fracturing technologies were developed or became widely used."  80 Fed. Reg. at 16,131.  The

18   agency observed that its "current regulations . . . lack substantive provisions to assure that wellbores

19   will be able to withstand the high pressures" associated with hydraulic fracturing, to "assure proper

20   management of recovered fluids," and to prevent other accidents.  BLM, Environmental Assessment:

21   Oil and Gas; Hydraulic Fracturing on Federal and Indian Lands , DOI-BLM-WO310-2015-001-EA

22   at 4 (Mar. 2015) (2015 EA).  BLM found that "it is necessary to have adequate requirements in place

23   without further delay."  80 Fed. Reg. at 16,180.

24        62.    BLM also rejected calls by industry trade associations and some states to leave

25   regulation of federal hydraulically-fractured wells to states.  BLM determined that existing state and

26   tribal regulations were inadequate to address the risks posed by modern hydraulic fracturing.  BLM

27   explained that "state regulations range from not regulating the activity at all in some states to fairly

28   comprehensive regulation in other states."  Id. at 16,190.  It recognized that "not all of the states to

which this final rule is applicable have the same requirements and, therefore, this standard is necessary to protect Federal and tribal lands." *Id.* at 16,161.  BLM described the Hydraulic Fracturing Rule as "establish[ing] baseline environmental safeguards for hydraulic fracturing operations across all public and Indian lands." *Id.* at 16,137.  The agency explained that it "has the responsibility of ensuring for the public and tribes that specific minimum standards are adhered to, and does not depend upon voluntary compliance." *Id.* at 16,180.

63.    The agency recognized that updated federal standards were necessary to meet its obligations for protecting public lands under FLPMA and the MLA, and its duties as a trustee on Indian lands.  BLM explained that "a major impetus for a separate BLM rule is that states are not legally required to meet the stewardship standards that apply to public lands and do not have trust responsibilities for Indian lands under Federal laws." *Id.* at 16,133.  Because state regulations vary widely, BLM determined that it "needs a baseline set of standards" that "meet the agency's unique responsibilities under the FLPMA, the Indian mineral leasing acts, and other statutes to administer oil and gas operations in a manner that protects Federal and Indian lands." *Id.* at 16,190.

64.    The Hydraulic Fracturing Rule provided for greater oversight by BLM of modern oil and gas development.  The 2015 Rule had four primary components:

- It updated well construction requirements for hydraulically fractured wells to match industry best practices, such as requiring mechanical integrity tests and cement evaluation logs to protect groundwater from faulty well construction.

- It updated BLM's waste management standards by requiring operators to store hydraulic fracturing wastes in covered above-ground tanks, rather than pits, to better protect groundwater, air quality, and wildlife.

- It required BLM review and prior approval of hydraulic fracturing operations to ensure that no pathways would allow gas or fluids to escape the underground zone being fractured and contaminate aquifers, or cause other accidents.

- It required disclosure of chemicals used in hydraulic fracturing to protect emergency responders, medical professionals, workers, and the public who might be exposed to the chemicals during accidents or spills.

1       65.    BLM discussed the benefits of the 2015 Rule at length. The agency recognized that requiring the use of tanks, instead of pits, would benefit air quality, water quality, and wildlife. *See id.* at 16,162 (explaining "that above-ground tanks, when compared to pits, are less prone to leaking, are safer for wildlife, and will have less air emissions"). BLM explained that requiring tanks to be covered, netted, or screened "helps prevent accidental deaths of species protected under the Migratory Bird Treaty Act or other laws." *Id.* at 16,203–04. BLM also determined that advance review and approval of fracturing operations by the agency was necessary to avoid accidents such as "frack hits," and for BLM to "make informed decisions" about managing those operations.[1] *Id.* at 16,194–95. BLM explained that there would be benefits from the 2015 Rule's well construction standards because "[t]he need to assure that hydraulic fracturing fluids are isolated from surface waters, usable groundwater, and other wells is clear." *Id.* at 16,180. And BLM explained that it was requiring disclosure of fracturing chemicals to "inform the community of the chemicals involved [in hydraulic fracturing], and to assist in clean-up of any spills." *Id.* at 16,149.

       66.    BLM analyzed the compliance costs of the Hydraulic Fracturing Rule and found them to be minimal, averaging only 0.1% to 0.2% of the expense of drilling and completing each new well.

**III.    Litigation Delays Implementation of the 2015 Rule.**

       67.    Industry trade associations, and several states, immediately challenged the Hydraulic Fracturing Rule in the U.S. District Court for the District of Wyoming. Some of the Plaintiffs in this case (the Citizen Groups) intervened on behalf of BLM to defend the Hydraulic Fracturing Rule.

       68.    The district court in 2015 issued a preliminary injunction preventing the Hydraulic Fracturing Rule from taking effect, and entered final judgment in 2016 setting aside the 2015 Rule. BLM and the Citizen Groups both appealed the merits ruling to the Tenth Circuit Court of Appeals. The appeal was fully briefed in October 2016, and oral argument scheduled for March 2017.

---

[1] A "frack hit" is an accident that occurs when hydraulic fracturing fluids intersect with the wellbore of a different well, potentially causing a well blowout or surface spill at the other well.

1

**IV.    BLM Proposes and Finalizes the Repeal.**

2      69.    In March 2017, one week before the scheduled oral argument, BLM asked the Tenth

3   Circuit to stay the appeal because the new presidential administration planned to rescind the

4   Hydraulic Fracturing Rule.  In a declaration, an Interior Department Assistant Secretary stated that

5   an "initial review has revealed that the 2015 Rule does not reflect . . . the current Administration's

6   policies and priorities concerning the regulation of hydraulic fracturing on Federal and Indian lands."

7      70.    Shortly thereafter, President Donald J. Trump issued Executive Order No. 13,783,

8   Presidential Executive Order on Promoting Energy Independence and Economic Growth, 82 Fed.

9   Reg. 16,093 (Mar. 28, 2017).  President Trump directed the Interior Department to review, and as

10   soon as practicable publish for notice and comment a proposed rule "suspending, revising, or

11   rescinding" the Hydraulic Fracturing Rule.  *Id.* at 16,096.  The next day, March 29, 2017, Secretary

12   of the Interior Ryan Zinke issued Secretarial Order No. 3349.  He instructed that "[a]s previously

13   announced by the Department, BLM shall proceed expeditiously with proposing to rescind" the

14   Hydraulic Fracturing Rule.

15      71.    BLM published its proposed repeal of the Hydraulic Fracturing Rule on July 25,

16   2017.  82 Fed. Reg. 34,464 (July 25, 2017).  In contrast to its process for developing the 2015 Rule,

17   the agency accepted public comment for only 60 days, and held no public forums or tribal

18   consultation sessions.  More than 108,000 members of the public submitted comments, including

19   Plaintiffs and their members.

20      72.    Meanwhile, the Tenth Circuit declined BLM's request to stay the pending appeal.

21   Instead, the court in September 2017 ordered that the appeal be dismissed, and vacated the district

22   court decision setting aside the Hydraulic Fracturing Rule.  The Tenth Circuit also ordered the

23   district court to dismiss the underlying litigation.  *Wyoming v. Zinke*, 871 F.3d 1133, 1137, 1146

24   (10th Cir. Sept. 21, 2017).  The effect of this ruling was to make the Hydraulic Fracturing Rule

25   effective as soon as the Tenth Circuit issued its mandate.  To avoid that result, BLM rushed to

26   complete its repeal of the 2015 Rule.

27      73.    Industry trade associations and states challenging the 2015 Rule also delayed the

28   Tenth Circuit mandate by filing several petitions for rehearing.  In connection with those petitions,

1    BLM asked the Tenth Circuit to stay the issuance of its mandate to allow the agency time to finalize

2    its repeal of the 2015 Rule.  On December 27, 2017, the Tenth Circuit denied all the petitions for

3    rehearing but stayed its mandate for two weeks, until January 12, 2018.

4    74.    Two days later, BLM published the final Repeal.  82 Fed. Reg. 61,924 (Dec. 29,

5    2017).  Due to the imminent issuance of the Tenth Circuit's mandate, BLM took the unusual step of

6    making the Repeal effective immediately, instead of after 30 days as ordinarily required by the APA.

7    *Id.* at 61,946 (discussing 5 U.S.C. § 553(d)(1), (3)).

8    75.    The Repeal restored BLM's 1980s-era regulations.  *Id.* at 61,945.  In addition to

9    rescinding the Hydraulic Fracturing Rule, BLM went even further and eliminated the requirement in

10   the 1982 regulations that operators get prior approval for "nonroutine fracturing jobs."  *Id.* at

11   61,935–36.  As a result, the Repeal makes BLM's hydraulic fracturing regulations weaker than they

12   have been in more than 35 years.

13   **V.    BLM Fails to Provide a Reasoned Explanation for the Repeal.**

14   76.    BLM's rationales for rescinding the Hydraulic Fracturing Rule are not supported by

15   the record before the agency.  First, as directed by President Trump's Executive Order and Secretary

16   Zinke's Order, BLM asserts that rescinding the 2015 Rule will promote domestic energy

17   development by lifting regulatory burdens.  *See, e.g.*, Press Release, BLM, *BLM Rescinds Rule on*

18   *Hydraulic Fracturing* (Dec. 28, 2017), https://www.blm.gov/press-release/blm-rescinds-rule-

19   hydraulic-fracturing (explaining that Repeal is "part of President Trump's goal to reduce the burden

20   of federal regulations that hinder economic growth and energy development"); 82 Fed. Reg. at

21   61,925 (citing Executive and Secretarial Order directions to promote "Energy Independence" and

22   eliminate regulations that "encumber energy production, constrain economic growth, and prevent job

23   creation").  But in issuing the Repeal, BLM was required to prepare a regulatory impact analysis

24   (RIA) assessing the economic effects of the agency's decision.  That RIA concludes that repealing

25   the 2015 Rule will do nothing to increase energy development.  *See* BLM, Regulatory Impact

26   Analysis for the Final Rule to Rescind the 2015 Hydraulic Fracturing Rule 59 (Dec. 2017) (RIA)

27   (admitting that "this final rule is unlikely to substantially alter the investment decisions of firms and

28   is unlikely to affect the supply, distribution, or use of energy").  BLM determined that the Repeal is

"not expected to impact the number of hydraulic fracturing operations" on federal and tribal lands. 82 Fed. Reg. at 61,941.  The agency also completed an EA for the Repeal, which concluded that it would not "increase or decrease the number of [those] operations that occur in the future."  BLM, Environmental Assessment:  Rescinding the 2015 Hydraulic Fracturing on Federal and Indian Lands Rule, DOI-BLM-WO-WO3100-2017-0001-EA at 24 (Dec. 2017) (EA).

77.     BLM's RIA explains why repealing the 2015 Rule will not promote energy development.  A modern hydraulically-fractured well typically costs $5.5 million to $7 million to drill and complete, and the compliance costs associated with the Hydraulic Fracturing Rule amount to only 0.1% to 0.2% of that expense.  RIA at 4, 54 n.35.  BLM's analysis of compliance costs, in fact, closely tracks the conclusions it reached in adopting the 2015 Rule.  As BLM explained in 2015, "the additional cost [of compliance] per hydraulic fracturing operation is insignificant when compared with the drilling costs in recent years, the production gains from hydraulically fractured well operations, and the net incomes of entities within the oil and natural gas industries."  80 Fed. Reg. at 16,217.  In rescinding the 2015 Rule, BLM conceded that the market price of crude oil—not federal regulation—was the only factor having "a significant relationship" affecting the number of wells drilled on federal and tribal lands.  RIA at 19.  Although BLM's rationale of promoting energy development comports with the direction from the President and Secretary Zinke, it is not borne out by the facts and is therefore arbitrary and capricious.

78.     With no evidence supporting the President's stated rationale for eliminating the Hydraulic Fracturing Rule, BLM offered two other explanations.  Both also "run[ ] counter to the evidence before the agency."  *State Farm*, 463 U.S. at 43.  BLM asserts that the 2015 Rule is "duplicative" of existing state and tribal regulatory programs, and "therefore unnecessarily burdensome on regulated entities."  82 Fed. Reg. at 61,939.  According to BLM, "there are currently laws or regulations to address hydraulic fracturing in all 32 of the states in which BLM currently

manages oil and gas" development.  *Id.*[2]  But regulations that "address hydraulic fracturing" are not all the same.  BLM's RIA demonstrates that the variety of existing state regulations are not comparable to 2015 Rule, and most do not mandate the same protections as BLM's rule.  For example, the 2015 Rule's limits on the use of waste pits and requirement for prior review and approval of fracturing operations go well beyond most state laws.  *See* RIA at 37–41.

79.     The difference is even greater on Indian lands, where only "some" tribes even have oil and gas regulatory programs in place, RIA at 3, and "tribal regulations or enforcement mechanisms . . . are not fully developed" in many areas.  82 Fed. Reg. at 61,939.  BLM's finding that the 2015 Rule is "duplicative" of existing state and tribal regulations contradicts the evidence.

80.     BLM also asserts that "[a]ny marginal benefits provided by the 2015 rule do not outweigh the rule's costs, even if those costs are a small percentage of the cost of a well."  *Id.* at 61,939.  The agency claims that the "potential incremental benefit of the 2015 rule has been *eliminated* by existing legal frameworks" under state and tribal laws.  RIA at 9 (emphasis added).  But the record does not support this claim, and BLM fails to explain its reversal on this factual question.  The agency has not changed its 2015 determination that compliance costs for the Rule are minimal (only 0.1% to 0.2% of the cost of drilling each well).  And BLM does not explain the change from the position it previously took that the "potential benefits of the [2015] rule are significant" and that the Hydraulic Fracturing Rule would "significantly reduce the risks associated with hydraulic fracturing operations on Federal and Indian lands, particularly risks to surface waters and usable groundwater."  80 Fed. Reg. at 16,203.  In rescinding that regulation, BLM admits that it has not quantified the Hydraulic Fracturing Rule's benefits but repeatedly asserts that adverse environmental impacts due to hydraulic fracturing operations are a "rarity."  *See, e.g.*, 82 Fed. Reg. at 61,938.

---

[2] In the preamble to the Repeal, BLM also asserts that a substantial expansion in state regulation has occurred since the 2015 Rule was issued, increasing the number of states with laws "addressing hydraulic fracturing" from 20 to 32 states.  82 Fed. Reg. at 61,925.  More than 99% of BLM-administered oil and gas development, however, occurs in nine states—and all nine of those states already had regulations "addressing hydraulic fracturing" in 2015.  RIA at 37; BLM, Regulatory Impact Analysis for Hydraulic Fracturing Rule 51, 56 (2015) (2015 RIA).  The adoption of fracturing regulations in 12 states with minimal federal and Indian development does not reflect a change in circumstances relevant to BLM's regulations.

81.     But the two requirements that drive most of the cost of the 2015 Rule (limiting the use of pits, and requirements to ensure adequate cementing of wells to protect underground sources of drinking water) address matters that are widely recognized as critical for environmental protection.  The record contains numerous examples of accidents caused by oil and gas waste pits. And the American Petroleum Institute warns that proper cementing "is a critical part of well construction" and that "[c]ement is fundamental in maintaining integrity throughout the life of the well" because cementing "provide[s] . . . full isolation of the groundwater" from oil and gas-producing formations.  BLM estimates that up to 5% of oil and gas wells have "inadequate cementing," and that the 2015 Rule will impose costs on about 5% of wells where companies are not following "industry recommended practice" for confirming the adequacy of the well cement.  RIA at 45 n. 31, 46 n. 32.  For those wells, the benefits of the Hydraulic Fracturing Rule will be significant. BLM fails to explain its conclusion that those benefits no longer justify the modest compliance costs of the 2015 Rule.  BLM's claim also fails to meet APA's standard of reasoned decision making, which requires agencies to consider both the advantages and disadvantages—in other words, both the costs and benefits—of their decisions.  *Michigan*, 135 S. Ct. at 2707.

82.     BLM's Repeal is also inconsistent with its statutory duties under FLPMA, the MLA, and as trustee for Indian lands.  In issuing the 2015 Rule, BLM found that the rule's new protections and additional requirements for federal oversight were necessary to satisfy the agency's obligations under FLPMA and other laws, and as trustee on Indian lands.  80 Fed. Reg. at 16,154; *see also id.* at 16,143, 16,147 (discussing necessity of specific provisions); 2015 EA at 5.  BLM also explained that "none of the BLM's statutory authorities authorize delegation of the BLM's regulatory duties to state or tribal agencies," 80 Fed. Reg. at 16,176, and that "[t]he BLM's regulations are necessary because the BLM is unable to delegate its responsibilities to the states and tribes," *id.* at 16,190.

83.     In its Repeal, BLM asserts that state and tribal regulatory programs "provide a better framework than the 2015 rule for mitigating the impacts of associated with hydraulic fracturing operations."  82 Fed. Reg. at 61,939.  The agency repeatedly explains its intent to defer to state regulation and to rely on "states and tribes taking the lead for regulating most hydraulic fracturing activities."  *Id.* at 61,945.  But BLM does not explain how this approach meets its statutory

1  obligations as federal land manager and trustee.  Nor does BLM explain its change in position from
2  2015, when it concluded that it could not leave those responsibilities to the states.

3  **VI.      BLM Fails to Comply with NEPA.**

4          84.      BLM's Repeal will have significant impacts on the environment.  It returns the
5  agency to outdated standards for construction and operations on thousands of new oil and gas wells
6  each year, and affects hundreds of millions of acres of federal and Indian lands.  For example,
7  repealing the requirement to use tanks is expected to result in hundreds of new waste pits each year,
8  which can cause groundwater, surface water, and air pollution and harm wildlife.  RIA at 47, 50, 53.

9          85.      Many of the NEPA "significance factors" further point to the need for an EIS.
10  Among other factors, for example, repealing the 2015 Rule "affects public health or safety,"
11  establishes a precedent for future actions by relaxing the requirements that apply when approving
12  operations, is closely related to the approval of drilling permits, which will have "cumulatively
13  significant impacts," and "threatens a violation" of FLPMA and other statutes.  40 C.F.R.
14  § 1508.27(b) (2), (6), (7), (10).

15          86.      Nevertheless, BLM chose to complete only an EA for the Repeal, rather than an EIS.
16  BLM determined that the Repeal "does not constitute a major Federal action significantly affecting
17  the quality of the human environment."  82 Fed. Reg. at 61,948.  This decision violated NEPA and
18  was arbitrary and capricious.

19          87.      BLM's EA also fails to address several aspects of the environmental impact of the
20  Repeal, as required by NEPA.  For example, it does not consider the reasonably foreseeable impacts
21  to groundwater, wildlife and other natural resources from allowing hundreds of new waste pits to be
22  constructed every year.  Nor does the EA discuss how tribal lands will be uniquely affected without
23  the benefit of the 2015 Rule or any other regulations addressing hydraulic fracturing.

24                          **FIRST CLAIM FOR RELIEF**

25                      **(*Arbitrary and Capricious Decisionmaking*)**

26          88.      The allegations in all previous paragraphs are incorporated by reference.

27

28

89. The APA requires courts to "set aside agency action, findings, and conclusions found to be[] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

90. BLM's Repeal is arbitrary and capricious.

91. BLM's explanation that the Repeal will promote energy development by removing regulatory burdens "runs counter to the evidence before the agency," *State Farm*, 463 U.S. at 43, because BLM admits that repealing the 2015 Rule is not expected to impact the number of hydraulic fracturing operations or otherwise increase energy development on federal and tribal lands. Similarly, the record contradicts BLM's assertion that the 2015 Rule is duplicative of state and tribal regulations.

92. BLM's claim that the 2015 Rule's costs exceed its benefits is also arbitrary and capricious. It is not supported by the evidence, and reverses the agency's prior decision based on "unexplained conflicting findings about the environmental impacts of a proposed agency action." *Organized Vill. of Kake*, 795 F.3d at 969. Further, in the Repeal, BLM focused on the costs of the Hydraulic Fracturing Rule, without addressing its benefits. Such unbalanced consideration of the costs and benefits of an agency action falls short of the APA's standard of reasoned decisionmaking. *See Michigan*, 135 S. Ct. at 2707.

93. The Repeal is therefore arbitrary and capricious in violation of the APA. 5 U.S.C. § 706(2)(A).

## SECOND CLAIM FOR RELIEF

### *(Violation of FLPMA, MLA, IMLA and APA)*

94. The allegations in all preceding paragraphs are incorporated by reference.

95. When an agency changes position, the APA requires that it demonstrate, among other things, that its new policy "is permissible under the statute," and "that there are good reasons for the new policy," which requires a more detailed explanation where the "new policy rests upon factual findings that contradict those which underlay its prior policy." *FCC v. Fox*, 556 U.S. at 515.

96. One cornerstone of whether a policy change is permissible is therefore the statutory mandate under which an agency operates. As federal land manager and trustee for Indian minerals,

BLM must comply with mandates under FLPMA, the MLA and the IMLA.  FLPMA requires BLM to issue "comprehensive" regulations to balance energy development with environmental protection, and to prevent "unnecessary or undue degradation" of public lands.  43 U.S.C. §§ 1701(a), 1732(b), 1733(a).  Under the MLA, BLM is responsible for issuing regulations ensuring that companies "exercise . . . reasonable diligence, skill, and care," and providing for "the protection of the interests of the United States" and "the safeguarding of public welfare."  30 U.S.C. §§ 187, 189.  BLM also is required to "regulate all surface-disturbing activities conducted pursuant to any lease" on federal land.  *Id.* § 226(g).  On tribal minerals, BLM has a trust responsibility to manage development for the benefit of the Indians, and to ensure that "[a]ll operations under any oil, gas, or other mineral lease" issued pursuant to the IMLA or other related statutes "shall be subject to the rules and regulations promulgated by the Secretary of the Interior."  25 U.S.C. § 396d.

97.    In promulgating the Hydraulic Fracturing Rule in 2015, BLM concluded that its updated requirements were necessary for the agency to fulfill its statutory and trust responsibilities on federal and tribal lands.  BLM also recognized that it is not permitted to delegate those responsibilities to states, and that state regulators are not required to meet the same stewardship responsibilities as BLM.

98.    BLM reversed itself when issuing the Repeal, asserting that state regulations "provide a better framework than the 2015 rule for mitigating the impacts associated with hydraulic fracturing operations."  BLM, however, has not shown that its reliance on state and tribal regulations "is permissible under the statute[s]" or "that there are good reasons for the new policy."  *FCC v. Fox*, 556 U.S. at 515.

99.    The Repeal also provides no explanation for its reversal from 2015.  BLM does not claim that the outdated 1980s federal regulations are sufficient to satisfy its responsibilities on federal and tribal lands.  Instead, the agency purports to rely on "states and tribes taking the lead for regulating most hydraulic fracturing activities."  But BLM does not assert that existing state and tribal regulations satisfy FLPMA, the MLA, the IMLA, or BLM's trust responsibilities.  Nor does BLM address its prior conclusion that it cannot rely on those regulations to satisfy its obligations as federal land manager and trustee for tribal lands.

100.     BLM's decision to rely on state and tribal regulations violates its statutory obligations under FLPMA, the MLA, and the IMLA and as trustee for Indian lands, and is arbitrary and capricious and in excess of statutory authority in violation of the APA.  5 U.S.C. § 706(2)(A), (C).  It also represents an unexplained change in position that is not permissible under BLM's governing statutes in violation of the APA.  *FCC v. Fox*, 556 U.S. at 515–16.

### THIRD CLAIM FOR RELIEF

### *(Violation of NEPA)*

101.     The allegations in all previous paragraphs are incorporated by reference.

102.     NEPA requires federal agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C); *see also* 40 C.F.R. § 1501.4.

103.     Agencies determine if an action is "significant[]" based on "considerations of both context and intensity."  40 C.F.R. § 1508.27.  Considerations of both context and intensity require BLM to prepare an EIS for the Repeal.

104.     BLM's failure to prepare an EIS for a nationwide regulatory action annually affecting thousands of oil and gas wells and hundreds of waste pits violates NEPA.  The agency's FONSI, which determined that an EIS was not necessary, is arbitrary and capricious.

105.     Moreover, BLM has violated NEPA by failing to take a hard look at the impacts of the Repeal, including but not limited to contamination from waste pits, and the risks to tribal lands that lack tribal regulatory programs.

106.     Accordingly, the Repeal violates NEPA and is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and without observance of procedure required by law.  5 U.S.C. § 706(2)(A), (D).

### PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

1.     Issue a declaratory judgment that BLM violated FLPMA, the MLA, the IMLA, NEPA, and its duties as trustee for Indian lands, and acted arbitrarily, capriciously, contrary to law, and in excess of statutory authority by promulgating the Repeal;

1    2.    Set aside the Repeal and order the Hydraulic Fracturing Rule reinstated in its entirety;

2    3.    Award Plaintiffs their costs, expenses, and reasonable attorney fees; and

3    4.    Provide such other relief as the Court deems just and proper.

4

5    Respectfully submitted this 24th day of January, 2018,

6                    /s/ Nathan Matthews
                    Nathan Matthews, CA Bar No. 264248
7                    Sierra Club
                    2101 Webster Street, Suite 1300
8                    Oakland, CA 94612
                    Phone: (415) 977-5695
9                    Fax: (510) 208-3140
                    nathan.matthews@sierraclub.org
10

11                   *Attorney for Plaintiff Sierra Club*

12                   Michael S. Freeman, CO Bar No. 30007 (*pro hac vice pending*)
13                   Joel Minor, CO Bar No. 47822 (*pro hac vice pending*)
                    Earthjustice
14                   633 17th Street, Suite 1600
                    Denver, CO 80202
15                   Phone: (303) 623-9466
                    mfreeman@earthjustice.org
16                   jminor@earthjustice.org

17

18                   *Attorneys for Plaintiffs Sierra Club, Center for Biological Diversity, Diné*
                    *Citizens Against Ruining Our Environment, Earthworks, Fort Berthold*
19                   *Protectors of Water and Earth Rights, Southern Utah Wilderness Alliance,*
                    *The Wilderness Society, and Western Resource Advocates*
20

21

22

23

24

25

26

27

28