1 | DOWNEY BRAND LLP
CHRISTIAN L. MARSH (Bar No. 209442)
2 | DONALD E. SOBELMAN (Bar No. 184028)
BENJAMIN C. LEE (Bar No. 282177)
3 | 455 Market Street, Suite 1500
San Francisco, CA 94105
4 | Telephone: (415) 848-4800
Facsimile: (415) 848-4801
5 | cmarsh@downeybrand.com
dsobelman@downeybrand.com
6 | blee@downeybrand.com

7 | WYOMING ATTORNEY GENERAL'S OFFICE
ERIK E. PETERSEN (WSB No. 7-5608) (*pro hac vice*)
8 | Senior Assistant Attorney General
2320 Capitol Avenue
9 | Cheyenne, WY  82002
Telephone: (307) 777-7895
10 | Facsimile: (307) 777-3542
erik.petersen@wyo.gov

11 |

*Counsel for Intervenor-Defendant State Of Wyoming*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| STATE OF CALIFORNIA, by and through XAVIER BECERRA, ATTORNEY GENERAL, | Case No. 4:18-cv-00521-HSG (related) |
|---|---|
| | Case No. 4:18-cv-00524-HSG (related) |
| Plaintiff, | |
| | **STATE OF WYOMING'S NOTICE OF MOTION AND CROSS MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO MOTIONS FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES; [PROPOSED] ORDER** |
| v. | |
| UNITED STATES BUREAU OF LAND MANAGEMENT; JOSEPH BALASH, Assistant Secretary for Land and Minerals Management, United States Department of the Interior; and RYAN ZINKE, Secretary of the Interior, | |
| | Date:    December 5, 2019 |
| Defendants. | Time:    2:00 p.m. |
| | Judge:    Haywood S. Gilliam, Jr. |
| | Courtroom 2, 4th Floor |
| | 1301 Clay Street, Oakland, CA 94612 |

*DOWNEY BRAND LLP* (vertical, left margin)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................iii

NOTICE OF CROSS-MOTION FOR SUMMARY JUDGMENT .............................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................... 1

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................. 2

I.    Federal Regulation of Hydraulic Fracturing ....................................................... 2

    A.    The Safe Drinking Water Act of 1974 ................................................ 2

    B.    The Energy Policy Act of 2005 ........................................................... 4

II.    State Regulation of Hydraulic Fracturing ......................................................... 5

III.    The Bureau of Land Management's 2015 Rule .................................................. 5

IV.    Judicial Review of the Bureau's 2015 Rule ...................................................... 7

V.    The Repeal Rule .............................................................................................. 8

ARGUMENT ................................................................................................................. 9

I.    Standard of Review .......................................................................................... 9

II.    The Bureau's Repeal Rule complied with applicable law ................................. 9

    A.    Applicable law does not require the Bureau to regulate fracking .................. 9

    B.    The Bureau provided adequate justification for the Repeal Rule ................. 9

    C.    The Bureau also recognized that it lacked the authority to promulgate the 2015 Rule ................................................................................ 10

        1.    The Bureau lacked the statutory authority to promulgate the 2015 rule............................................................................ 11

        2.    The Safe Drinking Water Act is the only source of federal authority to regulate subsurface fracking activities ............. 11

        3.    The Energy Policy Act of 2005 conclusively removed hydraulic fracturing from federal oversight ........................ 13

        4.    FLPMA is a land management statute; it is not an environmental protection statute......................................... 14

i

# TABLE OF CONTENTS
**(continued)**

Page

5.    The federal mineral leasing statutes govern leasing, not the
protection of underground sources of drinking water ......................... 17

a.    The Mineral Leasing Act ........................................................ 17

b.    The Right-of-Way Leasing Act ............................................... 19

c.    The Mineral Leasing for Acquired Lands Act ......................... 19

d.    The Federal Oil and Gas Royalty Management Act .............. 20

e.    The Bureau cannot manufacture statutory authority
simply by invoking a suite of statutes ...................................... 20

III.    The Bureau complied with the National Environmental Policy Act and the
Endangered Species Act ............................................................................. 21

IV.    Remedy ......................................................................................................... 21

CONCLUSION ............................................................................................................. 21

DOWNEY BRAND LLP

# TABLE OF AUTHORITIES

Page

**Cases**

*Adams Fruit Co. v. Barrett*,
  494 U.S. 638 (1990)..................................................................................................11

*Bowen v. Georgetown Univ. Hosp.*,
  488 U.S. 204 (1988)..................................................................................................11

*Cal. Coastal Comm'n v. Granite Rock Co.*,
  480 U.S. 572 (1987)..................................................................................................17

*Chevron U.S.A. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984)..................................................................................................11

*Conn. Nat'l. Bank v. Germain*,
  503 U.S. 249 (1992)..................................................................................................18

*Dodd v. United States*,
  545 U.S. 353 (2005)..................................................................................................18

*ETSI Pipeline Project v. Missouri*,
  484 U.S. 495 (1988)..................................................................................................11

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)..................................................................................................10

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000)..................................................................................................11

*Geosearch, Inc. v. Andrus*,
  508 F. Supp. 839 (D. Wyo. 1981)..............................................................................18

*Harvey v. Udall*,
  384 F.2d 883 (10th Cir. 1967)....................................................................................18

*Legal  Envtl. Assistance Found. v. EPA*,
  118 F.3d 1467 (11th Cir. 1997)..................................................2, 3, 4, 12, 13, 15

*Michigan v. EPA*,
  --- U.S. ---, 135 S. Ct. 2699 (2015)...........................................................................20

*Morales v. Trans World Airlines, Inc.*,
  504 U.S. 374 (1992)..................................................................................................17

*Motor Vehicle Ass'n v. State Farm Mut. Auto. Ins.*,
  463 U.S. 29 (1983)....................................................................................................10

*Nat. Res. Def. Council, Inc. v. Berklund*,
  609 F.2d 553 (D.C. Cir. 1979)....................................................................................17

iii

DOWNEY BRAND LLP

# TABLE OF AUTHORITIES
## (continued)

Page

*Tex. Oil & Gas Corp. v. Phillips Petroleum Co.*,
277 F. Supp. 366 (W.D. Okla. 1966) ...................................................................................... 19

*United States v. Wilson*,
503 U.S. 329 (1992).................................................................................................................. 13

*Util. Air Regulatory Grp. v. EPA*,
134 S. Ct. 2427 (2014).............................................................................................................. 20

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001).................................................................................................................. 20

**Statutes**

Safe Drinking Water Act, Pub. L. No. 93-523, 88 Stat. 1660 (1974)........................................ 2, 15

Federal Land Policy and Management Act, Pub. L. No. 94-579, 90 Stat. 2743 (1976) ......... 15, 16

Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594 (2005) .............................. 4, 13, 19

30 U.S.C. §§ 181 to 287 ................................................................................................................. 7

30 U.S.C. § 189 ...................................................................................................................... 17, 18

30 U.S.C. § 225 ............................................................................................................................. 18

30 U.S.C. §§ 301 to 306 ................................................................................................................. 7

30 U.S.C. § 301 ............................................................................................................................. 19

30 U.S.C. § 306 ............................................................................................................................. 19

30 U.S.C. §§ 351to 360 ............................................................................................................ 7, 19

30 U.S.C. § 351 ............................................................................................................................. 19

30 U.S.C. § 359 ............................................................................................................................. 19

30 U.S.C. §§ 1701 to 1759 ............................................................................................................. 7

30 U.S.C. § 1751 ........................................................................................................................... 20

42 U.S.C. §§ 300f to 300j-27 ......................................................................................................... 2

42 U.S.C. § 300g-2 ......................................................................................................................... 2

42 U.S.C. §§ 300h to 300h-8.............................................................................................. 2, 11, 16

42 U.S.C. § 300h ........................................................................................ 2, 4, 12, 13, 15, 19

42 U.S.C. §§ 300j-6 ...................................................................................................................... 12

iv

DOWNEY BRAND LLP

1

2

**TABLE OF AUTHORITIES**
(continued)

Page

DOWNEY BRAND LLP

3    43 U.S.C. §§ 1701 to 1787 ................................................................................................ 7

4    43 U.S.C. § 1702 ............................................................................................................... 15

5    43 U.S.C. §§ 1711 to 1720 .............................................................................................. 20

6    43 U.S.C. § 1711 ............................................................................................................... 15

7    43 U.S.C. § 1712 ............................................................................................................... 15

8    43 U.S.C. § 1732 ............................................................................................................... 15

9    43 U.S.C. § 1733 ............................................................................................................... 15

10   43 U.S.C. § 1740 ............................................................................................................... 15

11   **Rules**

12   *Rules Wyo. Oil & Gas Conservation Comm'n* , ch. 3, § 45 ................................................ 5

13   **Regulations**

14   40 C.F.R. § 147.2550 ......................................................................................................... 2

15   43 C.F.R. § 3162.3 ............................................................................................................. 5

16   **Other Authorities**

17   151 Cong. Rec. H2192-02, H2194-95 (daily ed. Apr. 20, 2005)............................... 4, 13

18   151 Cong. Rec. S9335-01, S9337 (daily ed. July 29, 2005) ..................................... 4, 13

19   Wyo. Dep't of Envtl. Quality Underground Injection Control; Program Approval, 48 Fed.
     Reg. 32344 (July 15, 1983)............................................................................................. 2

20

21   Oil and Gas; Well Stimulation, Including Hydraulic Fracturing, on Federal and Indian
     Lands, 77 Fed. Reg. 27691 (May 11, 2012) ................................................................. 5

22   Oil and Gas; Hydraulic Fracturing on Federal and Indian Lands, 80 Fed. Reg. 16128
     (March 26, 2015)................................................................................ 6, 7, 14, 17

23

24   Oil and Gas; Hydraulic Fracturing on Federal and Indian Lands; Rescission of a 2015
     Rule, 82 Fed. Reg. 61924 (December 29, 2017)........................... 8, 10, 12, 14, 17, 21

25   Brent D. Yacobucci, RL 32873, *Selected Environmental Issues Related to the Omnibus
     Energy Bill (H.R. 6), 109th Congress* (CRS 2005) ....................................... 3, 13, 15

26

27   H.R. Rep. No. 93-1185 (1974), *as reprinted in* 1974 U.S.C.C.A.N. 6454 ............... 3, 12

28

v

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3  *Safe Hydration is an American Right in Energy Development Act of 2019*, H.R. 3604, 116th Congress (2019) ................................................................................................. 5

4

5  *Review Programs and Activities of the Department of the Interior: Hearing Before the U.S. Senate Comm. on Energy and Natural Resources*, 113th Congress (2013) ............................... 5

6  United States Environmental Protection Agency, *Evaluation of Impacts to Underground Sources of Drinking Water by Hydraulic Fracturing of Coalbed Methane Reservoirs*, EPA 816-R-04-003 at ES-1 (June 2004) ................................................................................. 3

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DOWNEY BRAND LLP

vi

## NOTICE OF CROSS-MOTION FOR SUMMARY JUDGMENT

Please take notice that, on December 5, 2019, at 2:00 p.m. before the Honorable Haywood S. Gilliam, Jr., the State of Wyoming will move this Court to enter summary judgment on behalf of the State. This motion is supported by Federal Rule of Civil Procedure 56 and the attached Memorandum of Points and Authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

In these related lawsuits the State of California and various non-government organizations (the Advocacy Groups) allege that the Bureau of Land Management violated a host of federal statutes when the agency rescinded an unlawful 2015 regulation aimed at regulating hydraulic fracturing operations. This is a textbook example of an attempt to obstruct legitimate executive action based on frustration with the results of the most recent Presidential election. But elections have consequences. Here, one such consequence is a renewed policy choice by the current administration to leave the regulation of hydraulic fracturing to the states. But it is more than that. It is also a grudging recognition by the Bureau that it lacked the statutory authority to promulgate the 2015 rule in the first place.

In 2005, Congress explicitly withdrew authority to regulate hydraulic fracturing from the federal sphere. That was abundantly clear at the time that Congress acted, as evidenced by widespread criticism from the political opponents of the administration in power, including statements made on the floors of Congress. It is further evidenced by persistent (and unsuccessful) attempts by members of Congress to restore that power.

In 2015, the Bureau attempted to frustrate the will of Congress by promulgating the 2015 rule. In the rule at issue here (the Repeal Rule), the Bureau recognized both that the 2015 rule was unjustified as a practical matter **and** that the agency lacked the statutory authority to promulgate the rule in the first place. The Bureau supported the former with ample evidence in the rule and the administrative record. The Bureau recognized the reality of the latter following a merits decision by the United States District Court for the District of Wyoming. Accordingly, this Court should uphold the Repeal Rule and grant summary judgment to the Defendants.

DOWNEY BRAND LLP

1

# BACKGROUND

## I.     Federal Regulation of Hydraulic Fracturing

Hydraulic fracturing (also referred to as fracking) is a process by which oil and gas operators pump a mixture of water, propping agents (such as sand), and chemicals into the ground at high pressures to create fractures, thereby releasing oil and gas trapped inside tight rock formations. (ECF No. 116 at 2 n.1). Oil and gas operators have used this process to increase production from wells since the late 1940s. (DOIAR0001055, 0001078). Prior to 1974, Congress did not provide any federal agency with statutory authority to regulate sub-surface, fracking-related activities.

### A.     The Safe Drinking Water Act of 1974

In 1974, Congress enacted the Safe Drinking Water Act, which established a system of cooperative federalism for protecting drinking water sources. *See* Pub. L. No. 93-523, 88 Stat. 1660 (1974) (codified as amended at 42 U.S.C. §§ 300f to 300j-27). Under this Act, the Environmental Protection Agency (EPA) possesses the authority to regulate activities that affect drinking water sources, but states that wish to regulate in place of the EPA can submit an application to obtain primary enforcement responsibility, also known as primacy. 42 U.S.C. § 300g-2. A number of states, including Wyoming, possess such primacy. *See, e.g.*, Wyo. Dep't of Envtl. Quality Underground Injection Control; Program Approval, 48 Fed. Reg. 32344 (July 15, 1983); 40 C.F.R. 147.2550 .

Part C of the Act established a comprehensive scheme for EPA, or a state with primacy, to regulate all underground injection of potential contaminants (known as underground injection control (UIC)), including the injection of fluids used during the hydraulic fracturing process. 42 U.S.C. §§ 300h to 300h-8. The Court of Appeals for the Eleventh Circuit confirmed this scheme in 1997. *Legal  Envtl. Assistance Found. v. EPA*, 118 F.3d 1467, 1474 (11th Cir. 1997) (("it is clear that Congress dictated that *all* underground injection be regulated under the UIC programs") (citing 42 U.S.C. § 300h(b)(1)(A) (emphasis in original)). To wit:

///

///

2

DOWNEY BRAND LLP

1
2
3
4

> The definition of 'underground injection' is intended to be broad enough to cover any contaminant which may be put below ground level and which flows or moves.... The definition is not limited to the injection of wastes or to injection for disposal purposes; it is intended also to cover, among other contaminants, the **injection of brines and the injection of contaminants for extraction or other purposes**.

5  *Legal Envtl. Assistance Found.*, 118 F.3d at 1475 (quoting H.R. Rep. No. 93-1185, at 31 (1974),

6  *as reprinted in* 1974 U.S.C.C.A.N. 6454, 6483 (emphasis added)).

7      Around the time of the Eleventh Circuit's decision, the EPA initiated a study to "assess

8  the potential for contamination of underground sources of drinking water [] from the injection of

9  hydraulic fracturing fluids into coalbed methane [] wells." United States Environmental

10  Protection Agency, *Evaluation of Impacts to Underground Sources of Drinking Water by*

11  *Hydraulic Fracturing of Coalbed Methane Reservoirs*, EPA 816-R-04-003 at ES-1 (June 2004).[1]

12  As part of this study, the EPA concluded that "the injection of hydraulic fracturing fluids into

13  coalbed methane wells poses little or no threat to underground sources of drinking water and does

14  not justify additional study at this time." *Id*. Similarly, the EPA did not find a single confirmed

15  case linking the injection of fracking fluids into coalbed methane wells with drinking water well

16  contamination, despite the hydraulic fracturing of thousands of coalbed methane wells per year.

17  *Id*.

18      The EPA noted one caveat, however. "[I]n some cases, constituents of concern ... are

19  injected directly into [underground sources of drinking water]." *Id*. These constituents, such as

20  benzene, toluene, ethylbenzene, and xylenes, are introduced through the use of diesel fuel in

21  fracking fluids. *Id*. In an effort to reduce the use of these constituents in hydraulic fracturing

22  fluids, the EPA entered a Memorandum of Agreement with three of the largest oilfield service

23  companies at the time. Brent D. Yacobucci, RL 32873, *Selected Environmental Issues Related to*

24  *the Omnibus Energy Bill (H.R. 6), 109th Congress* 7 (CRS 2005).[2] This voluntary agreement

25  ---
[1] Available at https://fracfocus.org/sites/default/files/
26  publications/evaluation_of_impacts_to_underground_sources_of_drinking_water_by_hydraulic_f racturing_of_coalbed_methane_reservoirs.pdf

27  [2] Available at
https://www.everycrsreport.com/files/20050506_RL32873_6dd624d004c017af2ec759f21b1b792
28  1b6b2429e.pdf

DOWNEY BRAND LLP

3

1    detailed the companies' pledge to cease the use of diesel fuel in the hydraulic fracturing fluids

2    injected into coalbed methane production wells in underground sources of drinking water within

3    30 days of signing the agreement. *Id*. With the signing of this memorandum, the EPA and

4    industry eliminated the only potential concern found in the EPA study.

5         **B.     The Energy Policy Act of 2005**

6         In 2005, Congress enacted an amendment to the EPA's UIC program. This amendment,

7    which was contained within the 2005 Energy Policy Act, revised the definition of "underground

8    injection" to exclude "the underground injection of fluids or propping agents (other than diesel

9    fuels) pursuant to hydraulic fracturing operations related to oil, gas, or geothermal production

10   activities." Pub. L. No. 109-58, § 322, 119 Stat. 594 (2005) (codified at 42 U.S.C.

11   § 300h(d)(2)(B)). This change was both a response to the EPA study as well as a way to

12   legislatively overturn the Eleventh Circuit's decision in *Legal Environmental Assistance*

13   *Foundation v. Environmental Protection Agency*.

14        Members of Congress explained that this provision would "protect [energy companies]

15   from ever facing federal regulation of a practice of drilling for oil using the hydraulic fracturing

16   technique[.]" 151 Cong. Rec. H2192-02, H2194-95 (daily ed. Apr. 20, 2005) (statements of Rep.

17   Markey); *see also* 151 Cong. Rec. S9335-01, S9337 (daily ed. July 29, 2005) (statement of Sen.

18   Feingold). Members of Congress also characterized the amendment as a production incentive to

19   support the Energy Policy Act's broader policy of developing secure, affordable, and reliable

20   energy resources. Pub. L. No. 109-58; *see also* 151 Cong. Rec. H2192-02, H2226 (daily ed. Apr.

21   20, 2005). In short, the Energy Policy Act removed the EPA's authority to regulate fracking

22   under the Safe Drinking Water Act, unless a project involved the use of diesel fuel as fracking

23   fluid. 42 U.S.C. § 300h(b)(2)(B). By limiting the EPA's authority in this way, Congress removed

24   hydraulic fracturing from the regulatory purview of the Safe Drinking Water Act's UIC program.

25   Indeed, aside from the diesel fuel issue, Congress removed this industrial technique from federal

26   environmental regulation altogether.[3]

27   _____

28   [3] Recognizing this fact, some members of Congress have sponsored legislation that would return
     regulatory authority over hydraulic fracturing, under the Safe Drinking Water Act, to the EPA.

4

DOWNEY BRAND LLP

DOWNEY BRAND LLP

## II.     State Regulation of Hydraulic Fracturing

Around the time that Congress enacted the 2005 Energy Policy Act, oilfield developers were using hydraulic fracturing with increasing frequency. The primary driver of this increase in usage was new horizontal drilling techniques, which increased production dramatically. (*See* DOIAR0069851). In the face of increased use, and in the absence of federal regulation of fracking, the states stepped into the regulatory void.

Wyoming was one of the first states to regulate hydraulic fracturing. The Wyoming Oil and Gas Conservation Commission began regulating the process in 2010. *Rules Wyo. Oil and Gas Conservation Comm'n*, ch. 3, § 45.[4] Wyoming's regulations are comprehensive, requiring pre-stimulation fluid and chemical disclosures, monitoring and reporting of pressures and fracture lengths, and post-fracturing reporting of pressures and volumes of fluid used during the process. *Id*. Indeed, former Secretary of the Interior Sally Jewell, a member of President Obama's cabinet, recognized that Wyoming's program is "sophisticated in its oversight of hydraulic fracturing" and is "a good example of a State that's doing an effective job." *Review Programs and Activities of the Department of the Interior: Hearing Before the U.S. Senate Comm. on Energy and Natural Resources*, 113th Cong. 22 (2013) (statement of the Honorable Sally Jewell, Secretary of the Interior)[5]

## III.     The Bureau of Land Management's 2015 Rule

In 2012, the Bureau of Land Management proposed regulations governing hydraulic fracturing on federal and Indian land for the first time in the agency's long history. *See* Oil and Gas; Well Stimulation, Including Hydraulic Fracturing, on Federal and Indian Lands, 77 Fed. Reg. 27691 (May 11, 2012). Historically, the Bureau's only regulation that impacted hydraulic fracturing operations addressed **surface** disturbances related to drilling activities and did not regulate the fracturing process itself. *See* 43 C.F.R. § 3162.3-2(b) (requiring that operators need

---

*See, e.g.*, Safe Hydration is an American Right in Energy Development Act of 2019, H.R. 3604 (2019). To date, these legislative efforts have been unsuccessful.

[4] Available at https://rules.wyo.gov/

[5] Available at: http://www.energy.senate.gov/public/index.cfm/hearings-and-business-meetings?ID=32bf7170-3281-40c6-8900-801b9c54f18a

5

1    only obtain approval to conduct hydraulic fracturing if additional surface disturbance would

2    occur).

3         During the public comment process, many commenters alerted the Bureau to the fact that

4    it lacked the statutory authority necessary to regulate hydraulic fracturing because that authority

5    rests with the EPA, the states, and the Tribes. Oil and Gas; Hydraulic Fracturing on Federal and

6    Indian Lands, 80 Fed. Reg. 16128, 16186 (March 26, 2015). The Bureau acknowledged its lack of

7    jurisdiction to regulate groundwater sources, stating that "the [Bureau] lacks statutory authority to

8    control water quality and usage because that authority is vested with the EPA and the states." *Id*.

9    at 16143 ("The [Bureau] agrees that regulation of groundwater quality is not within the

10   [Bureau's] authority[.]"); *id*. at 16143. But the Bureau disagreed with the jurisdictional objections

11   to the rule, arguing that the Federal Land Policy and Management Act of 1976 (FLPMA) and

12   various mineral leasing statutes gave the agency authority for the 2015 rule. *Id*. at 16143, 16211.

13        Other commenters informed the Bureau that states and tribes already adequately regulated

14   hydraulic fracturing and that regulation by the Bureau would result in duplication of state effort

15   without any measurable environmental benefit. *Id*. at 16151, 16154. The Bureau's own findings

16   confirmed this. The Bureau reported that from fiscal year 2010 to fiscal year 2013, 99.3% of the

17   total number of well completions on federal and Indian land nationwide occurred in nine states,

18   all of which had existing hydraulic fracturing regulations. *Id*. at 16187-98. To date, neither the

19   Bureau nor the EPA have found **any** state hydraulic fracturing program to be insufficient or

20   inadequate.

21        Nevertheless, the Bureau justified the duplication of regulation based on a desire for

22   uniformity, while declining to address comments regarding the negligible environmental benefit

23   of the rule. *Id*. at 16154–55, 16178 (citing inconsistency across states as justification for

24   duplication). The Bureau dismissed comments that states and Tribes were already adequately

25   regulating the practice, instead asserting that, because the Secretary had a stewardship obligation

26   on federal and Indian land, the Bureau must regulate fracking operations. *Id*. at 16178.

27        Other commenters highlighted the lack of evidence showing any connection between

28   hydraulic fracturing and contamination of underground aquifers. *Id*. at 16180. The Bureau's

DOWNEY BRAND LLP

6

1   internal analysis supported these comments. (*See* DOIAR0037755_026; DOIAR0002408). The

2   Bureau responded to these comments by concluding that the need for the rule was clear, despite

3   the lack of any scientific support for this conclusion. *See* 80 Fed. Reg. at 16180.

4       On March 26, 2015, the Bureau finalized its rule to govern hydraulic fracturing on public

5   land. 80 Fed. Reg. 16128. The rule created a significant new permitting regime. *Id*. at 16129–30.

6   It required operators to obtain prior approval from the Bureau before conducting well stimulation

7   activity. *Id*. In order to obtain Bureau approval, the rule required operators to submit detailed

8   information regarding geological, hydrological, and engineering data; perform a successful

9   mechanical integrity test; create a plan to manage recovered fluids in above-ground storage tanks,

10   with limited exceptions; and disclose the chemical makeup of stimulation fluids to the public and

11   the Bureau, among other things. *Id*.

12       In the Federal Register notice for the rule, the Bureau did not identify any statute that

13   specifically authorizes the agency to regulate the process of hydraulic fracturing. *Id*. at 16217.

14   Instead, the Bureau relied on general rulemaking provisions within several land planning and

15   mineral leasing statutes that have never before been understood to grant the federal government

16   power to regulate hydraulic fracturing, including FLPMA, 43 U.S.C. §§ 1701-87, the Mineral

17   Leasing Act of 1920, 30 U.S.C. §§ 181-287, the 1930 Right-of-Way Leasing Act, 30 U.S.C.

18   §§ 301-06, the Mineral Leasing for Acquired Lands Act of 1947, 30 U.S.C. §§ 351-60, and the

19   Federal Oil and Gas Royalty Management Act of 1982, 30 U.S.C. §§ 1701-59.

20   **IV.   Judicial Review of the Bureau's 2015 Rule**

21       On March 26, 2015, Wyoming petitioned the United States District Court for the District

22   of Wyoming to review the Bureau's 2015 rule. (HFRR_078951). Other states and Tribes soon

23   joined the suit. (HFRR_080249; HFRR_080365; HFRR_080948). Shortly thereafter, a number of

24   petitioners, including Wyoming, filed motions seeking a preliminary injunction of the Bureau's

25   2015 rule. (HFRR_079098; HFRR_080249; HFRR_0807212; HFRR_080917). On September 30,

26   2015, the district court granted petitioners' various motions for a preliminary injunction.

27   (HFRR_081563-081616). In its ruling, the district court found that petitioners were likely to

28   succeed on the merits, both because the Bureau lacked the statutory authority to promulgate the

DOWNEY BRAND LLP

7

1    rule and because the Bureau acted arbitrarily when it promulgated the rule. (HFRR_081569-98).

2    The court also found that the other injunctive factors tipped in favor of petitioners.

3    (HFRR_081615).

4         On June 21, 2016, the district court issued a merits decision on various motions for

5    summary judgment and found that the Bureau lacked the statutory authority necessary to

6    promulgate the 2015 rule. (HFRR_022259-60). The court found that, because Congress had

7    "explicitly removed the only source of specific federal authority over fracking, it defies common

8    sense for the BLM to argue that Congress intended to allow it to regulate the same activity under

9    a general statute that says nothing about fracturing." (HFRR_022258). The court concluded:

10   "[t]he BLM has attempted an end-run around the [2005 Energy Policy Act]; however, regulation

11   of an activity must be by Congressional authority, not administrative fiat." (*Id*.). Accordingly, the

12   court set aside the 2015 rule. (*Id*.). Respondents appealed, but this appeal was eventually rendered

13   moot by the issuance of the rule at issue in this litigation. (HFRR_083428-29); Oil and Gas;

14   Hydraulic Fracturing on Federal and Indian Lands; Rescission of a 2015 Rule (Repeal Rule), 82

15   Fed. Reg. 61924, 61925 (Dec. 29, 2017).

16   **V.    The Repeal Rule**

17        On December 29, 2017, the Bureau promulgated a regulation that rescinded the agency's

18   unlawful 2015 regulation. 82 Fed. Reg. 61924 (Dec. 29, 2017). The Bureau found that the Repeal

19   Rule was necessary because: (1) the 2015 rule imposed administrative burdens and compliance

20   costs that were not justified; and (2) the Bureau lacked the authority to promulgate the 2015 Rule

21   in the first place. *Id*. at 61924, 61925, 61935. The validity of the Repeal Rule is at issue in this

22   litigation.

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

DOWNEY BRAND LLP

8

**ARGUMENT**

I.    **Standard of Review**

The State of Wyoming adopts and incorporates by reference the Standard of Review provided by the federal Defendants. (ECF No.116 at 7-8).[6]

II.    **The Bureau's Repeal Rule complied with applicable law.**

As discussed in the federal Defendants' Memorandum in Support, the Bureau complied with all applicable laws when it promulgated the Repeal Rule. (ECF No.116 at 32-52). The State of Wyoming highlights a few key points on this topic below, but otherwise limits itself to adopting and incorporating the federal Defendants' merits arguments by reference.

A.    **Applicable law does not require the Bureau to regulate fracking.**

The Advocacy Groups argue that the Bureau failed to comply with a suite of federal land management and mineral leasing statutes when it promulgated the Repeal Rule. (ECF No.110, 112). The gravamen of the Advocacy Groups' argument is that these statutes **require** the Bureau to promulgate regulations governing hydraulic fracturing operations. *Id*. But as the federal Defendants correctly point out, the statutes in question do no such thing. (ECF No.116 at 32-35). As discussed in further detail below, not one of these statues specifically addresses hydraulic fracturing operations. If Congress wanted to mandate that the Bureau regulate hydraulic fracturing, it would have done so expressly. (ECF No.116 at 33-34). It has not done so. To the contrary, Congress removed this industrial technique from federal environmental regulation altogether. Background, I-II at 4-5. Accordingly, the Advocacy Groups' arguments lack merit.

B.    **The Bureau provided adequate justification for the Repeal Rule.**

The Bureau provided "good reasons" that justify the promulgation of the Repeal Rule. (ECF No.116 at 35-41). Specifically, the Bureau found that the 2015 rule imposed "unnecessary regulatory burdens on energy development." *Id*. at 36 (citation omitted). This determination was rational and anything but arbitrary and capricious. The Bureau relied upon the fact that the vast

---

[6] In order to avoid duplication and to respect the page limitations imposed on Wyoming by this Court, the State will adopt and incorporate portions of the federal Defendants' Memorandum in Support to the extent practicable.

DOWNEY BRAND LLP

1   majority of states with federal oil and gas leases have developed regulations governing hydraulic

2   fracturing operations. *Id*. The Bureau also determined that the incremental benefits of the 2015

3   rule did not justify the regulatory burdens that the rule imposed. *Id*. at 38-41. While the Advocacy

4   Groups and the State of California would no doubt prefer a different policy direction, that desire

5   is irrelevant to the task at hand. The law requires the Bureau to "show that there are good reasons

6   for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The Bureau

7   did that. "[I]t need not demonstrate to a court's satisfaction that the reasons for the new policy are

8   better than the reasons for the old one." *Id*. Accordingly, this Court should uphold the Repeal

9   Rule.

C.   **The Bureau also recognized that it lacked the authority to promulgate the 2015 Rule.**

12      Contrary to the picture painted by the State of California and the Advocacy Groups, the

13   Bureau did not justify the Repeal Rule solely on the ground that it relieves operators of

14   unnecessary and unproductive regulatory burdens. (*Contra* ECF No.110, 112). The Bureau

15   provided another, independent justification for the Repeal Rule. Specifically, the Bureau

16   expressly stated that, while the Repeal Rule relieves operators of unnecessary and unproductive

17   regulatory burdens, "it also eliminates the need for further litigation about BLM's statutory

18   authority" to promulgate the 2015 rule. 82 Fed. Reg. at 61925; *see also id*. at 61935 (rescinding

19   the 2015 rule "alleviates" concerns about the Bureau's statutory authority).

20      While the Bureau did not explicitly admit that it lacked (and lacks) the authority necessary

21   to promulgate the 2015 rule, an admission anathema to federal agencies that seemingly cannot

22   help but attempt to aggrandize, the writing on the wall is clear. The Bureau promulgated the

23   Repeal Rule not only because the 2015 rule was (and is) unnecessary and unproductive; the

24   agency also promulgated the Repeal Rule because the agency lacked the authority to promulgate

25   the 2015 rule in the first place. *See* 82 Fed. Reg. at 61925. This reasoning provides an

26   independent and sufficient justification for the Repeal Rule. The fact that the agency provided

27   "less than ideal clarity" on this point does not undermine the justification because "the agency's

28   path can be reasonably discerned." *Motor Vehicle Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S.

10

*DOWNEY BRAND LLP*

29, 43 (1983) (citation omitted). Indeed, in light of the Wyoming district court's decision, the agency could not have come to a different conclusion.

### 1. The Bureau lacked the statutory authority to promulgate the 2015 rule.

When the United States District Court for the District of Wyoming determined that the Bureau lacked the authority to promulgate the 2015 rule, the court recognized that "[i]t is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." (HFRR_081570) (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988)). "Regardless of how serious the problem an administrative agency seeks to address, [] it may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.'" *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000) (quoting *ETSI Pipeline Project v. Missouri*, 484 U.S. 495, 517 (1988)). "[A]n agency may not bootstrap itself into an area where it has no jurisdiction." *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 650 (1990) (citation omitted).

Under these settled principles and in light of the relevant statutory authorities, the district court determined that Congress had not delegated authority to regulate fracking activity to the Bureau. (HFRR_083206-07). Therefore, the Bureau exceeded its statutory authority in promulgating the 2015 rule. (*Id.*). In arriving at this ruling, the district court applied the familiar *Chevron* analysis. (HFRR_083188) (citing *Chevron U.S.A. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)). Guided by *Chevron* and its progeny, the district court found that "Congress has directly spoken to the issue and precluded federal agency authority to regulate hydraulic fracturing not involving the use of diesel fuels." (HFRR_083189). Accordingly, the district court set aside the 2015 rule. (HFRR_083207). As discussed below, the court's reasoning is sound and fully supports the Bureau's decision to issue the Repeal Rule.

### 2. The Safe Drinking Water Act is the only source of federal authority to regulate subsurface fracking activities.

The Bureau does not have statutory authority to regulate hydraulic fracturing because the only federal statute on point delegates that power to the EPA and the states. 42 U.S.C. §§ 300h to

11

DOWNEY BRAND LLP

300h-8. When Congress created the Safe Drinking Water Act and the UIC program, it created a comprehensive scheme to protect groundwater from contamination through the regulation of all underground injection of contaminants. *Id*. Neither the Safe Drinking Water Act nor any other statute provides similar authority to the Bureau. Indeed, under the UIC program, states with primacy, such as Wyoming, are even required to apply their program regulations to federal agencies performing **any** underground injections. *Id*. § 300h(b)(1)(D). Accordingly, Wyoming has the authority to penalize any federal agency up to $25,000 per day per violation of the state's UIC program. *Id*. § 300j-6(b). This demonstrates that no one, not even the federal government, is immune from the requirement that **all** underground injections, including fracking-related injections, be regulated through the UIC program.

While this alone suffices to justify the Repeal Rule, it is worthwhile to note that the legislative history of the Safe Drinking Water Act also shows that the UIC program was meant to be an all-inclusive approach to the injection of underground contaminants. For example, Congress recognized that not only are municipalities, industry actors, and government agencies injecting waste product into the ground, but "[e]nergy production companies are using injection techniques to increase production and to dispose of unwanted brines brought to the surface during production." H.R. Rep. No. 93-1185 at 29, *as reprinted in* 1974 U.S.C.C.A.N. at 6481. In other words, fracking. Congress concluded that "[the UIC program] is intended to deal with **all** of the foregoing situations insofar as they may endanger underground drinking water resources." *Id*. (emphasis added). It is clear from the legislative history that Congress intended to regulate all underground injections through the UIC program, including those that increase production of oil and gas resources such as hydraulic fracturing.

The plain language and legislative history surrounding the Safe Drinking Water Act demonstrate that the UIC program is meant to comprehensively address all underground injections in the country. Because the EPA and the states administer the UIC program, the Bureau is without statutory authority to regulate the underground injection activity of hydraulic fracturing. This justifies the Bureau's Repeal Rule. *See* 82 Fed. Reg. at 61925; *see also id*. at 61935; *Legal Envtl. Assistance Found.*, 118 F.3d at 1474-75.

12

DOWNEY BRAND LLP

3. **The Energy Policy Act of 2005 conclusively removed hydraulic fracturing from federal oversight.**

With the passage of the Energy Policy Act, Congress removed the federal government from the realm of fracking, leaving the matter to the states to regulate. *See* 151 Cong. Rec. H2192-02, H2194-95 (daily ed. Apr. 20, 2005) (statements of Rep. Markey); *see also* 151 Cong. Rec. S9335-01, S9337 (daily ed. July 29, 2005) (statement of Sen. Feingold). Congress enacted the Energy Policy act to "ensure jobs for our future with secure, affordable, and reliable energy." Pub. L. No. 109-58; *see also* 151 Cong. Rec. H2192-02, H2226 (daily ed. Apr. 20, 2005). One of the many ways in which Congress set out to achieve this objective was by removing federal oversight of hydraulic fracturing; a burgeoning oil and gas recovery technique that the EPA had recently concluded "pose[d] little or no threat to [underground sources of drinking water] and does not justify additional study at this time." EPA study at ES-1, *supra* n. 1. Thus, Congress amended the definition of "underground injection" to exclude "the underground injection of fluids or propping agents (other than diesel fuels) pursuant to hydraulic fracturing operations related to oil, gas, or geothermal production activities." 42 U.S.C. § 300h(d)(1)(B)(ii). This language served multiple purposes. First, it acted as a legislative override of the Eleventh Circuit's decision in *Legal Environmental Assistance Foundation v. Environmental Protection Agency.*, *supra* at 4. Second, it served to protect the agreements made by the EPA with the companies that used diesel fuel in fracking fluids. *See* Yacobucci, *Selected Environmental Issues* at 5. Finally, it sought to remove the remaining authority to regulate hydraulic fracturing from federal purview, thereby leaving it to the states.

When Congress passed the Energy Policy Act, it determined that the public interest was best served by preventing federal regulation of hydraulic fracturing with one minor exception. *See* Pub. L. No. 109-58, § 322, 119 Stat. 594 (2005) (codified at 42 U.S.C. § 300h(d)(2)(B)) (leaving the regulation of hydraulic fracturing using diesel fuel to the EPA); *see United States v. Wilson*, 503 U.S. 329, 336 (1992) (explaining that the presumption is that "Congress contemplates a change whenever it amends a statute"). In other words, Congress weighed in on the issue of

13

DOWNEY BRAND LLP

1    whether the federal government or the states should regulate hydraulic fracturing and sided with

2    the states.

3         Despite the removal of almost all federal authority to regulate hydraulic fracturing, the

4    Bureau persisted in its rulemaking efforts. Indeed, comments made by the EPA during the

5    rulemaking process demonstrate that the 2015 Rule was merely an attempt by the Bureau to

6    circumvent the will of Congress and resurrect the EPA's pre-Energy Policy Act authority. The

7    EPA commented that the Bureau's method for ensuring well integrity for each well is "consistent

8    with the EPA regulatory approach for permitting Class II injection wells." (DOIAR0103278-

9    _0003). The EPA continued, commenting that the Bureau's requirements for remedial action in

10   response to inadequate cementing or excess pressure during operation are "similar to the well

11   integrity and corrective action requirements under the EPA regulations." (*Id.*). The EPA also

12   praised the Bureau for "[t]he requirement for operators to obtain [Bureau] approval for all

13   hydraulic fracturing operations through the submittal of detailed geologic, engineering, and

14   planning information, which is similar to EPA permit application requirements for Class II

15   injection wells." (DOIAR0103278_0002). Finally, the EPA compared the requirements for

16   isolating usable water zones, cementing holes, and mechanical integrity tests to "the protective

17   requirements the EPA regulations specify for injection wells under [the Safe Drinking Water

18   Act]." (DOIAR0103278_0002–03).

19        These comments show that the Bureau promulgated the 2015 rule in an attempt to regulate

20   hydraulic fracturing as Class II underground injection wells, which is what the EPA would have

21   done absent the removal of its authority to do so via the Energy Policy Act. In short, the 2015 rule

22   was a failed end-run around the Energy Policy Act and the will of Congress. The Repeal Rule is

23   justified as a result. *See* 82 Fed. Reg. at 61925; *see also id.* at 61935.

24        **4.    FLPMA is a land management statute; it is not an environmental**
             **protection statute.**

25

26        When it promulgated the 2015 Rule, the Bureau relied upon FLPMA for statutory support.

27   80 Fed. Reg. at 16217. But FLPMA is not a blank check. Rather, FLPMA charges the Bureau

28   with managing the public land for multiple use and sustained yield of natural resources through

14

DOWNEY BRAND LLP

1    routine planning and inventorying of land and uses. 43 U.S.C. §§ 1702(c), (h), 1711, 1712. In

2    pursuit of this general land management purpose, Congress authorized the Bureau to "prevent

3    unnecessary or undue degradation of the lands" and to promulgate regulations necessary to

4    achieve FLPMA's goals. 43 U.S.C. §§ 1732(b), 1733(a), 1740. Nothing in FLPMA or the case

5    law interpreting it provides the Bureau with the authority to regulate hydraulic fracturing or

6    underground injections of any kind. In fact, for three reasons, FLPMA points in precisely the

7    opposite direction.

8         First, section 1712(c)(8) of FLPMA requires the Bureau to "provide for compliance with

9    applicable pollution control laws, including State and Federal air, water, noise, or other pollution

10   standards and implementation plans" when creating management plans under FLPMA. 43 U.S.C.

11   §1712(c)(8). Given its plain meaning, this provision requires the Bureau to acknowledge

12   pollution control regulations created by the EPA and the states, and then ensure that the Bureau's

13   land management plans comply with these laws. *Id*. When drafting this section of FLPMA,

14   Congress clearly understood that entities other than the Bureau – including states – are charged

15   with regulating potential sources of pollution. *See id*. In short, Congress instructed the Bureau to

16   follow the applicable state and federal pollution laws, rather than giving it the authority to create

17   its own. 43 U.S.C. § 1712(c)(8). This congressional mandate requires the Bureau to comply with

18   the EPA's diesel fuel guidance as well as states' general hydraulic fracturing regulations when

19   creating its land management plans, rather than promulgating its own regulatory regime, as the

20   agency improperly attempted to do in the 2015 rule.

21        Second, the fact that the Safe Drinking Water Act was enacted two years **before** FLPMA

22   further belies the argument that FLPMA somehow grants the Bureau the authority to regulate

23   underground injection of hydraulic fracturing fluids. *Compare* Pub. L. No. 93-523, 88 Stat. 1660

24   (1974), *with* Pub. L. No. 94-579, 90 Stat. 2743 (1976). Through the passage of the Safe Drinking

25   Water Act, and more specifically the UIC program, Congress intended to regulate all

26   underground injection of contaminants, including hydraulic fracturing. *Legal Envtl. Assistance*

27   *Found.*, 118 F.3d at 1474 ("it is clear that Congress dictated that *all* underground injection be

28   regulated under the UIC programs") (citing 42 U.S.C. § 300h(b)(1)(A) (emphasis in original). In

15

DOWNEY BRAND LLP

addition, Congress did not intend for any provision in FLPMA to implicitly repeal any existing statutes. Pub. L. No. 94-579, § 701, 90 Stat. 2786-87 (1976) (uncodified). In short, FLPMA did not repeal the authority created two years before under the Safe Drinking Water Act. *Id.*

Third, Congress specifically stated that FLPMA may not be construed "as affecting in any way any law governing ... use of ... water on public lands" or be read "as superseding, modifying, or repealing ... existing laws applicable to the various Federal agencies which are authorized to develop or participate in the development of water resources or to exercise licensing or regulatory functions in relation thereto." *Id.* Likewise, it cannot be interpreted "as expanding or diminishing Federal or State jurisdiction, responsibility, interests, or rights in water resources development or control." *Id.* Thus, the unambiguous language of FLPMA shows that it does not vest the Bureau with authority to regulate fracking.

It is next to impossible to imagine a situation where Congress would, a mere two years after enacting specific environmental statutes governing underground injections, return to the table and grant a different agency identical powers through vague and unspecific language. As the district court in Wyoming said:

> Given Congress' enactment of the [Energy Policy Act], to nonetheless conclude that Congress implicitly delegated BLM authority to regulate hydraulic fracturing lacks common sense. Congress' inability or unwillingness to pass a law desired by the executive branch does not default authority to the executive branch to act independently, regardless of whether hydraulic fracturing is good or bad for the environment or the Citizens of the United States.

(HFRR_083206; *see also* HFRR_083202). Moreover, the specific language in the Safe Drinking Water Act regarding the regulation of underground injections demonstrates that Congress knew what language to use had it desired to give another agency the same powers. *See* 42 U.S.C. §§ 300h to 300h-8. It did not do that in FLPMA.

The mere two-year time difference between the statutes, coupled with the lack of specific language in FLPMA aimed at underground injections, shows that Congress did not intend to give the Bureau any authority over underground injections or hydraulic fracturing via FLPMA. The specific language in the Safe Drinking Water Act that created the UIC program controls over any

1  general notions contained in FLPMA. *See, e.g.*, *Morales v. Trans World Airlines, Inc.*, 504 U.S.

2  374, 384-85 (1992) (explaining that the specific governs over the general in the statutory

3  construction context). This tracks the Supreme Court's balancing of environmental regulation and

4  land management:

5       [T]he line between environmental regulation and land use planning will not always
         be bright . . . . However, the core activity described by each phrase is undoubtedly
6       different. Land use planning in essence chooses particular uses for the land;
         environmental regulation, at its core, does not mandate particular uses of the land
7       but requires only that, however the land is used, damage to the environment is kept
         within prescribed limits.

8

9  *Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 587 (1987).

10      In sum, because FLPMA does not provide the Bureau with the statutory authority

11  necessary to regulate underground injections on public land, the Bureau's 2015 rule was in excess

12  of the agency's statutory authority and not in accordance with the law. The Repeal Rule is

13  justified as a result. *See* 82 Fed. Reg. at 61925; *see also id*. at 61935.

14           **5.    The federal mineral leasing statutes govern leasing, not the protection
                      of underground sources of drinking water.**

15

16      The Bureau's past reliance on a suite of federal mineral leasing statutes to promulgate the

17  2015 rule provides no more support than FLPMA. Accordingly, the Bureau's reliance on these

18  statutes as justification for its rule was misplaced. *See* 80 Fed. Reg. at 16217. The Bureau

19  recognized this when it issued the Repeal Rule. *See* 82 Fed. Reg. at 61925; *see also id*. at 61935.

20                     **a.    The Mineral Leasing Act**

21      In citing the Mineral Leasing Act to support the 2015 rule, the Bureau asserted general

22  authority to "prescribe necessary and proper rules and regulations and to do any and all things

23  necessary to carry out and accomplish the purposes of [the Mineral Leasing Act]." 30 U.S.C.

24  § 189. However, the Mineral Leasing Act merely creates a program for leasing mineral deposits

25  on public land for private mining. *Nat. Res. Def. Council, Inc. v. Berklund,* 609 F.2d 553, 555

26  (D.C. Cir. 1979). "The purpose of the [Mineral Leasing] Act is to promote the orderly

27  development of oil and gas deposits in publicly owned lands of the United States through private

28

DOWNEY BRAND LLP

1   enterprise." *Geosearch, Inc. v. Andrus*, 508 F. Supp. 839, 842 (D. Wyo. 1981) (citing *Harvey v.*

2   *Udall*, 384 F.2d 883, 885 (10th Cir. 1967)). The authority to regulate hydraulic fracturing does

3   not flow from the authority to lease and develop public property.[7]

4       As part of the orderly development of the nation's resources, the Mineral Leasing Act

5   makes all leases on federal land explicitly conditioned upon the lessee's use of "all reasonable

6   precautions to prevent waste of oil or gas developed in the land, or the entrance of water through

7   wells drilled by him to the oil sands or oil-bearing strata, to the destruction or injury of the oil

8   deposits." 30 U.S.C. § 225. This language squares with the general sentiment during the early

9   1900s (when Congress enacted the Mineral Leasing Act) that underground water posed a threat to

10  the oil and gas resources of the country. (DOIAR0001663). "Early casing and cementing

11  programs of oil and gas wells were practical measures to prevent waters from adjacent non-

12  productive formations and upper aquifers from flooding the oil-producing reservoir during

13  drilling and subsequent production activities." (*Id.*). "In these early years the principal focus was

14  on protection of the petroleum resource from the effects of water incursion and not on protection

15  of water resources themselves." (*Id.*).

16      The Mineral Leasing Act unambiguously directs the Bureau to protect oil and gas

17  resources from the intrusion of **water**. The Bureau cannot suddenly invert this straightforward

18  statement of law, nearly 100 years after Congress enacted it, to now require the Bureau to protect

19  underground sources of water from oil and gas activities. Courts "'must presume that [the]

20  legislature says in a statute what it means and means in a statute what it says there.'" *Dodd v.*

21  *United States*, 545 U.S. 353, 357 (2005) (quoting *Conn. Nat'l. Bank v. Germain*, 503 U.S. 249,

22  253–54, (1992)).

23      Furthermore, the Mineral Leasing Act states that "[n]othing in this Act shall be construed

24  or held to affect the rights of the States or other local authority to exercise any rights which they

25  may have[.]" 30 U.S.C. § 189. This constraint on the reach of the Mineral Leasing Act is

26  "likewise a limitation on the Secretary of the Interior as to his regulation making authority set out

DOWNEY BRAND LLP

---

27  [7] The same reasoning applies to the Bureau's misplaced reliance on the Indian Mineral Leasing

28  Act and the Indian Mineral Development Act. (HFFR_081573-74).

18

DOWNEY BRAND LLP

1  in [section 189]." *Tex. Oil & Gas Corp. v. Phillips Petroleum Co.*, 277 F. Supp. 366, 370 (W.D.

2  Okla. 1966), *aff'd* 406 F.2d 1303 (10th Cir. 1969). As explained above, by enacting the Energy

3  Policy Act, Congress removed federal oversight of hydraulic fracturing, leaving the right to

4  regulate fracking in the capable hands of the states. For this reason, the Mineral Leasing Act

5  prohibits the Bureau's 2015 rule, rather than authorizes it.

### b.      The Right-of-Way Leasing Act

7         The Bureau's past claim that the Right-of-Way Leasing Act authorized the 2015 rule is

8  similarly spurious. The Right-of-Way Leasing Act grants to the Department of the Interior the

9  authority to "adopt rules and regulations governing the exercise of the discretion and authority

10 conferred by" the Act. 30 U.S.C. § 306. Congress enacted the Right-of-Way Leasing Act to

11 expand the Secretary of the Interior's ability to lease federal land for mineral development by

12 authorizing leasing of minerals beneath railroads and other federal rights-of-way. 30 U.S.C.

13 § 301. General authority to make rules relating to terms of leases on federal rights-of-way does

14 not translate to the ability to create a comprehensive regulatory scheme for all hydraulic

15 fracturing on federal land, especially when Congress has deliberately left that duty to the states.

16 *See* Energy Policy Act of 2005, Pub. L. No. 109-58, § 322, 119 Stat. 594 (2005) (codified at 42

17 U.S.C. § 300h(d)(2)(B)).

### c.      The Mineral Leasing for Acquired Lands Act.

19        Nor was the Bureau able to find authority for the 2015 rule in the Mineral Leasing for

20 Acquired Lands Act of 1947. Congress granted to the Bureau the authority to "prescribe such

21 rules and regulations as are necessary and appropriate to carry out the purposes" of the Mineral

22 Leasing for Acquired Lands Act of 1947. 30 U.S.C. §§ 351, 359. However, Congress enacted the

23 Mineral Leasing for Acquired Lands Act to amend and expand the Bureau's authority to lease

24 public land for mineral development, not to grant the Bureau the authority to craft a framework

25 for regulating hydraulic fracturing or underground injections. *Id.* §§ 351-60. The Bureau could

26 not properly rely on the Mineral Leasing for Acquired Lands Act as justification for the 2015

27 rule, which is further justification for the Repeal Rule.

DOWNEY BRAND LLP

1

            **d.**      **The Federal Oil and Gas Royalty Management Act.**

2            The Bureau also attempted to justify the 2015 rule under the Federal Oil and Gas Royalty

3  Management Act of 1982. 30 U.S.C. § 1751. In enacting the Federal Oil and Gas Royalty

4  Management Act, Congress again granted general rulemaking authority to the Secretary. *Id.*

5  ("The Secretary shall prescribe such rules and regulations as he deems reasonably necessary to

6  carry out this Act."). Rather than create authority for the Bureau to regulate hydraulic fracturing,

7  however, the Federal Oil and Gas Royalty Management Act provides for financial audits of lease

8  accounts, lessee liability for royalty payments, security plans to prevent theft of oil and gas,

9  annual lease site inspections, and civil and criminal penalties for noncompliance. 43 U.S.C.

10  §§ 1711-20. Similar to other provisions the Bureau claims as authority for its Fracking Rule, such

11  general rulemaking authority to create royalty collection systems cannot justify broad regulation

12  of hydraulic fracturing.

13            **e.**      **The Bureau cannot manufacture statutory authority simply by**

14                       **invoking a suite of statutes.**

15            Even considering the sum of its parts, the Bureau's attempt in 2015 to regulate hydraulic

16  fracturing through its suite of mineral leasing statutes fell far short. Invoking all of the mineral

17  leasing statutes at once does not transform their purpose from property management into

18  environmental protection. When an agency puts forth rulemaking such as the 2015 rule, it "must

19  operate within the bounds of reasonable interpretation." *Michigan v. EPA*, --- U.S. ---, 135 S. Ct.

20  2699, 2707 (2015). The Bureau's past justification for its rulemaking was akin to "discover[ing]

21  in a long-extant statute an unheralded power to regulate a significant portion of the American

22  economy," and as such, should be met with a heavy dose of skepticism. *Util. Air Regulatory Grp.*

23  *v. EPA*, --- U.S. ---, 134 S. Ct. 2427, 2444 (2014) (citation omitted). After all, Congress "does not

24  alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions."

25  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Put simply, Congress does not hide

26  elephants in mouseholes. *Id.*

27            Because none of the land management or mineral leasing statutes provide authority to

28  regulate for the protection of groundwater, the Bureau was without statutory authority to

20

1    promulgate the 2015 rule. It is for this reason, among others, that the Bureau issued the Repeal

2    Rule. *See* 82 Fed. Reg. at 61925; *see also id*. at 61935. This Court should uphold the Repeal Rule

3    as a result.

### III.   The Bureau complied with the National Environmental Policy Act and the Endangered Species Act.

6          The State of Wyoming adopts and incorporates by reference the federal Defendants'

7    arguments related to the Bureau's compliance with the National Environmental Policy Act and

8    the Endangered Species Act. (ECF No.42-52).

### IV.   Remedy

10         For the reasons discussed above, this Court should uphold the Repeal Rule. In the event

11   that this Court rules in favor of the Advocacy Groups and the State of California, this Court

12   should refrain from vacating the Repeal Rule and permit the parties to brief the issue of remedy.

13   Simply vacating the Repeal Rule makes no sense. Doing so would bring the 2015 rule back into

14   effect. This would force the regulated community to immediately begin to take steps to comply

15   with the 2015 rule, even though it is manifestly clear that Wyoming and others will simply return

16   to the District of Wyoming to obtain an injunction against this plainly unlawful regulation. Such

17   disruption is unnecessary and unwise. For these reasons, the State of Wyoming echoes the request

18   by the federal Defendants that, if this Court rules in favor of the Advocacy Groups and the State

19   of California, the Court should provide the parties with the opportunity to brief the issue of

20   remedy. (ECF No.116 at 56-57).

### CONCLUSION

22         For the reasons discussed above and in the federal Defendants' Memorandum in Support,

23   the State of Wyoming respectfully requests that this Court uphold the Repeal Rule and grant the

24   Defendants' motions for summary judgment.

25   ///

26   ///

27   ///

28   ///

DOWNEY BRAND LLP

21

1   Respectfully submitted this 23 day of August, 2019.

2

3                                          DOWNEY BRAND LLP

4                                          /s/ *Christian L. Marsh*
                                           CHRISTIAN L. MARSH (Bar No. 209442)
5                                          DONALD E. SOBELMAN (Bar No. 184028)
                                           455 Market Street, Suite 1500
6                                          San Francisco, CA 94105
                                           Telephone: (415) 848-4800
7                                          Facsimile: (415) 848-4801
                                           cmarsh@downeybrand.com
8                                          dsobelman@downeybrand.com

9

10                                         /s/ *Erik E. Petersen*
                                           WYOMING ATTORNEY GENERAL'S OFFICE
11                                         ERIK E. PETERSEN (WSB No. 7-5608) (*pro hac vice*)
                                           Senior Assistant Attorney General
12                                         2320 Capitol Avenue
                                           Cheyenne, WY  82002
13                                         Telephone: (307) 777-7895
                                           Facsimile: (307) 777-3542
14                                         erik.petersen@wyo.gov

15                                         *Counsel for the State of Wyoming*

16

17

18

19

20

21

22

23

24

25

26

27

28

DOWNEY BRAND LLP