1

2

3

4                          UNITED STATES DISTRICT COURT

5                         NORTHERN DISTRICT OF CALIFORNIA

6

7    STATE OF CALIFORNIA, et al.,              **ORDER GRANTING DEFENDANTS'**
                                               **MOTION FOR SUMMARY JUDGMENT,**
8                   Plaintiffs,                **DENYING PLAINTIFFS' MOTIONS FOR**
                                               **SUMMARY JUDGMENT, AND**
9           v.                                 **GRANTING INTERVENORS' MOTIONS**
                                               **FOR SUMMARY JUDGMENT**
10   BUREAU OF LAND MANAGEMENT, et
     al.,                                      Case No. 18-cv-00521-HSG
11
                    Defendants.                Re: Dkt. Nos. 112, 116, 119, 120, 121
12
     SIERRA CLUB, et al.,
13                                             Case No. 18-cv-00524-HSG
                    Plaintiffs,
14                                             Re: Dkt. Nos. 110, 126, 129, 130, 131
            v.
15
     RYAN ZINKE, et al.,
16
                    Defendants.
17
           Pending before the Court are cross-motions for partial summary judgment in two related
18
     cases, *State of California v. Bureau of Land Management, et al.*, No. 18-cv-00521-HSG, and
19
     *Sierra Club v. Zinke*, No. 18-cv-00524-HSG.  *See* Case No. 18-cv-0521, Dkt. Nos. 112
20
     ("California Mot."), 116 ("BLM Mot."), 119 ("Wyoming Mot."), 120 ("API Mot."), and 121
21
     ("Associations Mot."); Case No. 18-cv-0524, Dkt. No. 110 ("Citizen Group Mot.").[1]  Plaintiffs in
22
     both cases challenge Federal Defendants' promulgation of a final rule that repealed a previous rule
23
     regulating hydraulic fracturing operations on federal and tribal lands.  Plaintiffs assert that the
24
     issuance of the final rule violated the Administrative Procedure Act ("APA"), National
25
     Environmental Policy Act ("NEPA"), and the Endangered Species Act ("ESA").
26

27   ─────────────────────

28   [1] Defendants and intervenors filed the same motions in both cases.  *See also* Case No. 18-cv-0524,
     Dkt. Nos. 126, 129, 130, 131.

*United States District Court*
*Northern District of California*

The Court **GRANTS** Federal Defendants' motion for summary judgment on all grounds and **DENIES** Plaintiffs' motions.  The Court further **GRANTS** Wyoming's, API's and the Associations' motions for summary judgment.

## I.   BACKGROUND

### A.   Hydraulic Fracturing Regulation

On March 26, 2015, after almost five years of extensive rulemaking, the Bureau of Land Management ("BLM") issued the final version of its regulations applying to hydraulic fracturing on federal and Indian lands.  80 Fed. Reg. 16,128–16,222 (Mar. 26, 2015) ("the 2015 Rule"). According to BLM, the 2015 Rule "serve[d] as a much-needed complement to existing regulations designed to ensure the environmentally responsible development of oil and gas resources on Federal and Indian lands, which were finalized nearly thirty years ago, in light of the increasing use and complexity of hydraulic fracturing coupled with advanced horizontal drilling technology." *Id.* at 16,128.  Hydraulic fracturing is a process used by oil and natural gas producers to increase production from wells.  *Id.* at 16,130.  It "involves the injection of fluid under high pressure to create or enlarge fractures in the reservoir rocks."  *Id.* at 16,131.  Typically, the fluid is composed of water, sand, and chemical additives to create and "enlarge fractures in the reservoir rocks" while "limiting the growth of bacteria and preventing corrosion of the well casing."  *Id.*  In order to "to ensure wellbore integrity, protect water quality, and enhance public disclosure of chemicals and other details of hydraulic fracturing operations," BLM issued the 2015 Rule scheduled to take effect on June 24, 2015.  *Id.* at 16,129.

The 2015 Rule had four primary elements.  First, the 2015 Rule updated the well construction and testing requirements to ensure best practices for casing and cementing wells and "protect and isolate all usable water zones, lost circulation zones, abnormally pressured zones, and any prospectively valuable deposits of minerals."  *Id.* at 16,136.  Second, operators were required to use storage tanks instead of pits to "reduce[] the potential risk to surface and groundwater resources," as well as provide environmental benefits for wildlife.  *Id.* at 16,203–04.  Third, the 2015 Rule provided greater oversight and information to BLM by requiring that operators seek approval for all hydraulic fracturing operations, instead of only "non-routine" operations.  *Id.* at

United States District Court
Northern District of California

United States District Court
Northern District of California

16,146–16,153.  Finally, operators were required to disclose the chemical additives used for hydraulic fracturing by submitting the information to an independent organization, FracFocus, which had an existing database and provided "the quickest, most cost-effective way to make the information public."  *Id.* at 16,169.

On March 26, 2015, the States of Wyoming and Colorado filed a lawsuit in the district of Wyoming seeking review of the 2015 Rule under the APA.  *Wyoming v. United States Dep't of the Interior*, No. 15-CV-43-S (D. Wyo. March 25, 2015), Dkt. No. 1.  The court granted a preliminary injunction on September 30, 2015.  *See Wyoming v. United States Dep't of the Interior*, 136 F. Supp. 3d 1317, 1354 (D. Wyo. 2015).  The court then set aside the 2015 Rule finding that BLM lacked statutory authority to promulgate the rule.  *State of Wyoming v. United States Dep't of the Interior*, No. 2:15-CV-041-SWS, 2016 WL 3509415, at *12 (D. Wyo. June 21, 2016), *judgment vacated, appeal dismissed sub nom. Wyoming v. Zinke*, 871 F.3d 1133 (10th Cir. 2017).  The Tenth Circuit, however, vacated this decision as prudentially unripe given BLM's pending action to rescind the 2015 Rule, even though BLM had initially sought to uphold and enforce the 2015 Rule on appeal.  871 F.3d at 1144.

On March 28, 2017, President Trump issued Executive Order 13783, titled "Promoting Energy Independence and Economic Growth."  82 Fed. Reg. 16,093.  The order directed agencies to "immediately review existing regulations that potentially burden the development or use of domestically produced energy resources and appropriately suspend, revise, or rescind those that unduly burden the development of domestic energy resources beyond the degree necessary to protect the public interest or otherwise comply with the law."  *Id.*  The following day, then Secretary of the Interior Ryan Zinke issued Secretarial Order 3349, which specifically directed "BLM [to] proceed expeditiously with proposing to rescind final rule entitled, 'Oil and Gas; Hydraulic Fracturing on Federal and Indian Lands, 80 Fed. Reg. 16[,]128 (March 26, 2015)."  HFRR_019417.[2]  Thereafter, BLM proposed to repeal the 2015 Rule on July 25, 2017, noting that

---

[2] The Court adopts BLM's Bates labeling prefixes for the Administrative Record in this case. Documents with the prefixes "DOIAR" and "DOIPS" are documents included in the administrative record originally compiled for the development of the 2015 Rule.  Case No. 18-cv-0524, Dkt. Nos. 93, 94.  Documents with the prefix "HFRR" are documents originally compiled as

they agency now "believe[s] [the 2015 Rule] is unnecessarily duplicative of state and some tribal regulations and imposes burdensome reporting requirements and other unjustified costs on the oil and gas industry."  82 Fed. Reg. 34,464.  On December 29, 2017, BLM published a final rule repealing the entirety of the 2015 Rule.  82 Fed. Reg. 61,924 (the "Repeal").

**B.    Procedural Background**

On January 24, 2018, the State of California ("California Plaintiffs") filed suit against Defendants BLM, Joseph Balash in his official capacity as the Assistant Secretary for Land and Minerals Management of the United States Department of the Interior, and Ryan Zinke in his official capacity as Secretary of the Interior ("the Secretary") (collectively, "Federal Defendants"), asserting three claims for declaratory and injunctive relief under the APA, the Federal Land Policy and Management Act ("FLPMA"), the Mineral Leasing Act ("MLA"), the Indian Mineral Leasing Act ("IMLA"), and NEPA.  Case No. 4:18-cv-00521-HSG, Dkt. No. 1 ("Cal. Compl.").  Also, on January 24, 2018, a coalition of eight citizen groups ("Citizen Group Plaintiffs" or "Citizen Groups") asserted substantively similar claims against the Secretary, BLM, and the United States Department of the Interior.  Case No. 4:18-cv-00524-HSG, Dkt. No. 1.  On April 3, 2018, Citizen Group Plaintiffs amended their complaint to add a claim under the Endangered Species Act ("ESA").  Case No. 4:18-cv-00524-HSG, Dkt. No. 55 at 32.

Apart from Citizen Groups' ESA claim, these related cases are substantively identical. Plaintiffs[3] challenge BLM's 2017 Repeal of the 2015 Rule.  Plaintiffs contend that the 2015 Rule facilitated environmentally responsible oil and gas development, and that BLM's rescission of the rule violates the above-listed statutes.  On May 2, 2018, the Court granted the State of Wyoming's ("Wyoming") unopposed motion to intervene in both cases.  *See* Case No. 4:18-cv-00524-HSG, Dkt. No. 70; Case No. 4:18-cv-00524-HSG, Dkt. No. 33.  On July 17, 2018, the Court granted the Independent Petroleum Association of America and Western Energy Alliance's (collectively, the "Associations") and the American Petroleum Institute's ("API") motions to intervene in both

part of the administrative record for the Repeal.  *Id.*  Finally, BLM filed two supplemental sets of administrative record documents with the prefixes "HFRR_SUPP_1" and "HFRR_SUPP_2" after the rest of the administrative record.  See Dkt. Nos. 106, 108.
[3] "Plaintiffs" refers collectively to California Plaintiffs and Citizen Group Plaintiffs.

United States District Court
Northern District of California

1   actions.  *See* Case No. 4:18-cv-00524-HSG, Dkt. No. 77.

2   **II.   LEGAL STANDARD**

3       The Court's review in this action is governed by the Administrative Procedure Act

4   ("APA").  *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 558

5   (1978); 16 U.S.C. § 1855(f)(1); 5 U.S.C. § 706(2)(A)–(D).  The Court must set aside the final

6   agency decision if it is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance

7   with law . . . ."  5 U.S.C. § 706(2)(A).  Summary judgment is an appropriate procedural

8   mechanism "for deciding the legal question of whether the agency could reasonably have found

9   the facts as it did."  *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 770 (9th Cir. 1985).  Under the

10  arbitrary and capricious standard, the Court must "determine whether the [agency] has considered

11  the relevant factors and articulated a rational connection between the facts found and the choices

12  made."  *Midwater Trawlers Coop v. Dep't of Comm.*, 282 F.3d 710, 716 (9th Cir. 2002).  This

13  standard is deferential, presuming the agency action to be valid and affirming if there is a

14  reasonable basis for the decision.  *Ranchers Cattlemen Action Fund v. U.S. Dep't of Agric.*, 499

15  F.3d 1108, 1115 (9th Cir. 2007).  The Court reviews the administrative record as a whole in

16  making this assessment.  *See Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 420 (1971);

17  *see also Ranchers Cattlemen Action Fund*, 499 F.3d at 1115.

18  **III.   ANALYSIS**

19      **A.   Standing**

20       Federal Defendants first argue that Plaintiffs lack standing to bring these suits.  BLM Mot.

21  at 8–32.  They contend that "Plaintiffs' alleged harms are not 'fairly traceable' to the 2017

22  [Repeal] itself; they are instead general harms related to hydraulic fracturing that were not

23  addressed by the 2015 Rule and therefore cannot be traced to the repeal of that Rule."  *Id.* at 8–9.

24  The Associations similarly argue that California Plaintiffs fail to show injury traceable to the

25  Repeal.  Associations Mot. at 7–10.[4]

26   

27  [4] Federal Defendants also argue that California Plaintiffs are not within the zone of interests to
    bring an action under the IMLA.  BLM Mot. at 29–32.  At the hearing, California Plaintiffs
    stipulated to dismissal of the part of the second cause of action that relies on the IMLA.  *See* Case

28  No. 4:18-cv-00521-HSG, Dkt. No. 147 at 6:13–7:5.  Thus, the Court need not address this

*United States District Court*
*Northern District of California*

1    A plaintiff seeking relief in federal court bears the burden of establishing "the irreducible

2  constitutional minimum" of standing.  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)

3  (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  First, the plaintiff must have

4  "suffered an injury in fact."  *Id.*  This requires "an invasion of a legally protected interest" that is

5  concrete, particularized, and actual or imminent, rather than conjectural or hypothetical.  *Lujan*,

6  504 U.S. at 560 (internal quotation marks omitted).  "Although imminence is concededly a

7  somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the

8  alleged injury is not too speculative for Article III purposes—that the injury is certainly

9  impending."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Lujan*, 504 U.S. at

10  564 n.2).  Second, the plaintiff's injury must be "fairly traceable to the challenged conduct of the

11  defendant."  *Spokeo*, 136 S. Ct. at 1547.  Third, the injury must be "likely to be redressed by a

12  favorable judicial decision."  *Id.* (citing *Lujan*, 504 U.S. at 560–61).

13         **i.    California Plaintiffs**

14    "States are not normal litigants for the purposes of invoking federal jurisdiction," and are

15  "entitled to special solicitude in [the] standing analysis."  *Massachusetts v. EPA*, 549 U.S. 497,

16  518–20 (2007).  For instance, states may sue to assert their "quasi-sovereign interest in the health

17  and well-being—both physical and economic—of [their] residents in general."  *Alfred L. Snapp &*

18  *Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607 (1982).  In that case, however, the "interest must be

19  sufficiently concrete to create an actual controversy between the State and the defendant" such that

20  the state is more than a nominal party.  *Id.* at 602.

21    The Court finds that California Plaintiffs have made a sufficient showing of injuries in fact

22  that are concrete, particularized, and fairly traceable to the Repeal so as to establish standing.

23  Contrary to Federal Defendants' argument, California Plaintiffs' financial harms are not

24  generalized to hydraulic fracturing, but are traceable to the Repeal of the 2015 Rule.

25    California Plaintiffs allege that "the repeal of the [2015] Rule eliminates an additional

26  layer of regulatory protection on federal lands in California that supplements and bolsters state

27

28  argument.

6

United States District Court
Northern District of California

1   hydraulic fracturing regulations, including well stimulation requirements.  As a result of the

2   Repeal, responsibility for ensuring compliance with hydraulic fracturing regulations will fall

3   entirely on California, placing additional burdens on State resources."  Case No. 4:18-cv-00521-

4   HSG, Dkt. No. 127-1 at ¶ 5 ("Borkavich Decl.").  Given that "California contains millions of acres

5   of federal lands that are managed by [BLM] for energy production," including an additional

6   720,000 acres opened recently to oil and gas leasing with an additional 1.2 million acres proposed

7   in California's central valley, the burdens placed on California's resources to ensure state

8   regulatory compliance on BLM lands increased due to the Repeal.  Case No. 4:18-cv-00521, Dkt.

9   No. 127-2 at ¶¶ 6, 12 ("Lozo Decl.").

10      "Monetary expenditures to mitigate and recover from harms that could have been

11   prevented absent the [Repeal] are precisely the kind of 'pocketbook' injury that is incurred by the

12   state itself."  *Air All. Houston v. Envtl. Prot. Agency*, 906 F.3d 1049, 1059–60 (D.C. Cir. 2018);

13   *see also California v. Azar*, 911 F.3d 558, 571 (9th Cir. 2018) (finding standing where interim

14   federal rules exempting employers with religious and moral objections from providing

15   contraceptive coverage would lead to women losing employer-sponsored contraceptive coverage,

16   "which [would] then result in economic harm to the states").  Although Federal Defendants argue

17   that these declarations do not sufficiently allege injury since BLM will continue to regulate oil and

18   gas operations, *see* Case No. 4:18-cv-00524, Dkt. No. 140 at 1–4 ("BLM Reply"), BLM is

19   disavowing any intention to ensure compliance with the additional requirements imposed by the

20   2015 Rule.  The 2015 Rule would have imposed stricter requirements on operators beyond BLM's

21   pre-existing regulations, and instead would have matched or exceeded state regulations.  Thus,

22   California Plaintiffs state an injury in fact, since they will need to ensure state regulatory

23   compliance to fill the regulatory gap that will be created if the 2015 Rule does not take effect.[5]

24      California Plaintiffs also allege a procedural injury resulting from BLM's failure to comply

25   with NEPA.  "When a litigant is vested with a procedural right, that litigant has standing if there is

26

27

28

---

[5] For this reason, BLM's argument that California Plaintiffs fail to allege a legally cognizable injury separate from the generalized interest of its citizens (*parens patriae*) is unavailing.  *See* BLM Mot. at 26–29.

United States District Court
Northern District of California

some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Massachusetts*, 549 U.S. at 517–18.  Here, California Plaintiffs have been "accorded a procedural right" because NEPA provides that "State, and local agencies, which are authorized to develop and enforce environmental standards" may comment on proposed federal action "significantly affecting the human environment."  42 U.S.C. § 4332(2)(C).  Plaintiffs allege that BLM failed to prepare an Environmental Impact Statement ("EIS") and that the significant environmental impacts of the Repeal were not properly considered.  "An 'increased risk' to the environment is all that is needed to establish the injury prong for standing in these environmental procedural claims."  *Methow Forest Watch v. U.S. Forest Serv.*, 383 F. Supp. 2d 1263, 1268 (D. Or. 2005) (quoting *Ecological Rights Found. v. Pacific Lumber, Co.*, 230 F.3d 1141, 1151 (9th Cir. 2000)).  California Plaintiffs allege that the Repeal removed numerous provisions of the 2015 Rule designed to protect the environment, thus increasing the risk to the environment.  Whether the Repeal did so as a practical matter is a merits question, but California Plaintiffs sufficiently meet the threshold to establish standing. [6]

> ### ii.   Citizen Group Plaintiffs

Citizen Group Plaintiffs allege that they have established standing through member declarations that allege economic injuries to "members who live close to BLM-approved oil and gas wells [who] face increased risk of harm to their drinking water supplies and livestock," as well as "aesthetic and recreational" injuries caused by the Repeal.  Case No. 4:18-cv-00524, Dkt. No. 137 ("Citizen Group Reply") at 4.  "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Friends of the Earth v. Laidlaw Envtl. Services,* 528 U.S. 167, 180 (2000).  Plaintiffs adequately allege injury in fact when they "aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity."  *Id.* at 181.

---

[6] For the same reasons, Citizen Group Plaintiffs also have procedural standing to bring a NEPA claim.

United States District Court
Northern District of California

Citizen Group Plaintiffs first provide declarations from members that live close to BLM lands with oil and gas development alleging economic injuries.  *See* Case No. 4:18-cv-00524, Dkt. No. 110-3.  A Diné Citizens Against Ruining Our Environment ("Diné CARE") member alleges that the Repeal removed "adequate regulations to protect [the] groundwater against contamination from spills from fracking waste pits, or cracks in the cement surrounding oil and gas wells that can release fracking fluids into the surrounding groundwater."  *Id.* at 20 ¶ 13 ("Begaye Decl.").  Similarly, a member of Earthworks living near BLM lands notes that the 2015 Rule's "ban on open pit unlined waste storage, and requirements to use tanks instead of pits would . . . reduc[e] the chances of a leaky pit allowing dangerous chemicals to affect my water supply," and its "requirement for disclosure of the chemicals in the hydraulic fracturing fluids would benefit" him by alerting him "if there were another incident of water well contamination from drilling activities."  *Id.* at 34 ¶¶ 13–14 ("Dronkers Decl.").  Both declarations comment on broad environmental concerns and note past incidents where oil and gas drilling resulted in water contamination.

The Court agrees with Federal Defendants that allegations of past injuries are not sufficient to show actual or imminent injury.  Although Citizen Group Plaintiffs argue that the removal of these protections increases the risk of harm to members' drinking supply, this only points to a hypothetical, future injury.  In *Laidlaw*, which Citizen Group Plaintiffs cite, it was "undisputed that [defendant's] unlawful conduct—discharging pollutants in excess of permit limits—was occurring at the time the complaint was filed," making the environmental plaintiffs' allegations that the conduct affected their recreational, aesthetic, and economic interests actual and imminent.  528 U.S. at 184.  Here, Citizen Group Plaintiffs do not similarly allege any current or ongoing environmental harm.  They instead rely on limited past harms from hydraulic fracturing to argue that a future without the potential protections of the 2015 Rule, now removed by the Repeal, increases the risk of injury to its members.  This cannot meet the standard of actual and imminent injury.  Despite ongoing hydraulic fracturing operations on BLM lands, Citizen Group Plaintiffs do not provide any evidence of current harms, but point only to a hypothetical "risk" of them.  These unique circumstances prevent Citizen Group Plaintiffs from establishing that an "injury is

certainly impending" from environmental risk in this case.  *Clapper*, 568 U.S. at 409.

Citizen Group Plaintiffs also provide declarations of members who enjoy recreational activities on or close to BLM lands to argue that they have standing to bring this case.  A member of the Center for Biological Diversity provided a declaration noting that he "regularly recreate[s] and observe[s] plants and wildlife on BLM-managed public lands," but found that "enjoyment of these areas is diminished by the impacts of oil and gas activities in the area, which fragment habitat, displace endangered species, generate traffic, destroy views, and reduce air and water quality."  Case No. 4:18-cv-00524, Dkt. No. 110-3 at 8–10 ("Anderson Decl.").  Similarly, a Sierra Club member "regularly photographed and hiked" in Grand County, Utah, but "[his] enjoyment of photography on public lands has been and continues to be compromised by the dispersed oil and gas wells, the road systems that break up the flow of the landscape, waste pits, flaring, pipelines, and by the need to be constantly vigilant of heavy truck traffic that might threaten my safety."  *Id.* at 90–95 ("Rau Decl.").

These member declarations fail to identify how the Repeal, rather than oil and gas activity generally, is the cause of their recreational and aesthetic injuries.  Citizen Group Plaintiffs argue that the Repeal of several key provisions of the 2015 Rule (specifically, using tanks instead of pits for fracturing waste, updating well construction, and informational requirements) is the cause of its members injuries, but they fail to connect the lack of these provisions to any recreational or aesthetic injuries.  Citizen Group Reply at 3–4.  There is no evidence to support the allegations that reinstating the 2015 Rule would redress the recreational or aesthetic harms, largely because the land continues to be open to oil and gas development.  Furthermore, when publishing the 2015 Rule, BLM never represented that the updated casing requirements would prevent all possible leaks such that the Court can deem the Repeal to be the cause of possible leaks in the future.  Similarly, using tanks instead of pits for fracturing waste was never represented as a solution to all harm to wildlife caused by hydraulic fracturing.  Instead, the 2015 Rule sought to increase regulations for continued hydraulic fracturing operations in order to curtail some environmental

1    consequences of those operations.[7]  Thus, Citizen Group Plaintiffs cannot trace any alleged

2    recreational or aesthetic harm to the Repeal, as hydraulic fracturing generally is the cause of the

3    alleged injuries.

4            Federal Defendants also argue that Citizen Group Plaintiffs lack standing to bring suit

5    under the ESA.  Citizen Group Plaintiffs claim that BLM violated the ESA by failing to consult

6    with the Fish and Wildlife Service ("FWS") prior to taking any action that "may affect" a

7    threatened or endangered species.  16 U.S.C. § 1536(a)(4).  "In order to establish an injury in fact

8    in the context of a claimed procedural error in an agency's decisionmaking process, a plaintiff

9    must show that '(1) the [agency] violated certain procedural rules; (2) these rules protect [a

10   plaintiff's] concrete interests; and (3) it is reasonably probable that the challenged action will

11   threaten their concrete interests.'"  *Friends of Santa Clara River v. United States Army Corps of*

12   *Engineers*, 887 F.3d 906, 918 (9th Cir. 2018) (quoting *San Luis & Delta-Mendota Water Auth. v.*

13   *Haugrud*, 848 F.3d 1216, 1232 (9th Cir. 2017)).  As noted above, this only requires a showing of

14   "an 'increased risk' to the environment," not that the outcome of the consultation would have been

15   different.  *Methow Forest Watch v*, 383 F. Supp. 2d at 1268 (quoting *Pacific Lumber*, 230 F.3d at

16   1151).  Specifically for an ESA claim, plaintiff must "submit affidavits or other evidence showing,

17   through specific facts, not only that listed species were in fact being threatened by [the challenged

18   action], but also that one or more of [plaintiffs'] members would thereby be 'directly' affected

19   apart from their 'special interest' in th[e] subject."  *Lujan*, 504 U.S. at 563 (quoting *Sierra Club v.*

20   *Morton*, 405 U.S. 727, 730 (1972)).

21           Citizen Group Plaintiffs point to declarations representing that the Repeal threatens the

22

23   ───────────────

     [7] Unlike *Ctr. For Biological Diversity v. Kempthorne*, 588 F.3d 701 (9th Cir. 2009) and *W.*
24   *Watersheds Project v. Kraayenbrink*, 632 F.3d 472 (9th Cir. 2011), Citizen Group Plaintiffs do not
     show that their members' injuries are caused by the regulations at issue.  In *Kempthorne*,
25   plaintiffs' recreational interest in polar bears and walruses was directly threatened by a regulation
     that authorized "the non-lethal 'take' of polar bears and Pacific walrus by oil and gas activities."
26   588 F.3d at 705.  In *Kraayenbrink*, plaintiffs similarly could point to the "reduce[d] public
     oversight of federal grazing management" as a direct cause of their aesthetic injury in
27   "involvement in public land grazing management."  632 F.3d at 481, 485.  Citizen Group
     Plaintiffs cannot similarly show in this unique case that any change in the recreational and
28   aesthetic interests of its members is linked to the Repeal, given that the lands, at all times,
     remained open to oil and gas development.

United States District Court
Northern District of California

environment and wildlife, including species listed under the ESA. *See e.g.*, Case No. 4:18-cv-00524, Dkt. No. 110-3 at 9–13 ¶¶ 8–23("Anderson Decl.") (discussing an interest in the San Joaquin kit fox, blunt-nosed leopard lizard, and California condors at risk of harm due to open waste pits, which would have been tanks under the 2015 Rule).[8] Federal Defendants argue that these declarations are insufficient and lack the specificity required to show that it is reasonably probable that the environment and listed species will be threatened by the Repeal. BLM Mot. at 10–13. Federal Defendants point to existing regulations within the geographic regions discussed in the declarations to argue that other regulations and policies provide the same protections as the 2015 Rule. *Id.* at 13–26; BLM Reply at 7–11. Thus, Federal Defendants argue that Citizen Group Plaintiffs rely on a hypothetical and attenuated chain of events to show that the challenged action will threaten their interests. BLM Mot. at 13–16.

Federal Defendants overstate the standing requirements. Citizen Group Plaintiffs' declarations provide sufficient evidence that Plaintiffs have concrete interests in ESA-listed species in several specific sites on BLM land. The declarations also sufficiently detail how it is reasonably probable that the challenged action will threaten these interests. Citizen Group Plaintiffs point to the same three differences between the 2015 Rule and the Repeal (again, using tanks instead of pits for fracturing waste, updating well construction, and informational requirements), and argue that these differences threaten concrete interests in the environment and ESA-listed species. Citizen Group Mot. at 17. Specifically, the supporting declarations point to the use of tanks instead of pits as the primarily reason that threatened species will be affected. *See e.g.* McKinnon Decl at 7–8 (noting that above-ground tanks prevent spills and leaks, "reducing the potential for impacts [to] groundwater, surface water, and critical habitats for endangered fish."). This sufficiently alleges injury for a procedural violation of an environmental statute.

---

[8] Citizen Group Plaintiffs submitted additional declarations with its reply highlighting interests in additional ESA-listed species. *See* Case No. 4:18-cv-00524, Dkt. No. 137-1 at 3–9 ("McKinnon Decl.") (describing interests in the Colorado Pikeminnow, Razorback sucker, Humpback chub, and Bonytail fish in the San Juan River in Utah); *id.* at 55–59 ("Donnelly Decl.") (describing interests in Railroad Valley springfish in Nevada); *id.* at 72–74 ("Zukoski Decl.") (describing interests in the Gunnison sage grouse in Colorado). The Court considers these additional declarations because Federal Defendants were able to respond in their reply. *See Dutta v. State Farm Mut. Auto. Ins. Co.*, 895 F.3d 1166, 1172 (9th Cir. 2018).

United States District Court
Northern District of California

United States District Court
Northern District of California

1  Federal Defendants also argue that Citizen Group Plaintiffs fail to demonstrate the

2  redressability of the alleged injury.  Federal Defendants point to existing regulations within the

3  geographic regions discussed in the declarations to argue that other regulations and policies

4  provide the same protections as the 2015 Rule.  BLM Mot. at 13–26; BLM Reply at 7–11.

5  However, this granular examination regarding each species appears to be the exact type of analysis

6  that is supposed to be the subject of consultation or study with FWS.  But at this stage, Citizen

7  Group Plaintiffs need only show that a consultation "*may* influence the agency's ultimate

8  decision." *Santa Clara River*, 887 F.3d at 918 (emphasis added); *see also Cottonwood Envtl. Law*

9  *Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1082 (9th Cir. 2015) (a plaintiff need not "establish how

10  the [agency action] would lead to different, injurious results at the project-specific level" because

11  "this places an inappropriate burden on [plaintiff]."). Here, "the causation and redressability

12  requirements [for standing] are relaxed" because Citizen Group Plaintiffs "assert a violation of a

13  procedural right conferred by a federal statute." *Santa Clara River*, 887 F.3d at 918 (internal

14  quotations and citations omitted) (alterations in original).  Given this softened standard, Citizen

15  Group Plaintiffs sufficiently meet their burden by showing that a consultation could lead to the

16  conclusion that compliance with the ESA requires preservation of some or all environmental

17  protections outlined in the 2015 Rule, despite the existence of other regulations.

18  In summary, the Court finds that California Plaintiffs have standing to bring all alleged

19  claims, excluding those that they have stipulated to dismiss.  The Court finds that Citizen Group

20  Plaintiffs lack standing to bring their APA claims, but have standing to bring claims alleging

21  procedural violation of NEPA and the ESA.

22  **B.  APA Claims**

23  Under the APA, a district court can set aside agency decisions only if the action is

24  "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.

25  § 706(2)(A).  "The scope of [the Court's] review under this standard is 'narrow'; [and] 'a court is

26  not to substitute its judgment for that of the agency.'" *Judulang v. Holder*, 132 S. Ct. 476, 483

27  (2011) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463

28  U.S. 29, 43 (1983)).  Nonetheless, when reviewing an agency action, a court "must assess, among

other matters, 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Id.* at 484 (quoting *State Farm*, 463 U.S. at 43). "That task involves examining the reasons for agency decisions—or, as the case may be, the absence of such reasons." *Id.* "Agency action should be overturned only when the agency has 'relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Pac. Coast Fed'n of Fishermen's Ass'n, Inc. v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir. 2001) (quoting *State Farm*, 463 U.S. at 43). The agency's findings are reviewed under the "substantial evidence" standard. *Family Inc. v. U.S. Citizenship & Immigration Servs.*, 469 F.3d 1313, 1315 (9th Cir. 2006). Under this standard, a court will not disturb an agency's findings "unless the evidence presented would compel a reasonable finder of fact to reach a contrary result." *Monjaraz–Munoz v. I.N.S.*, 327 F.3d 892, 895 (9th Cir. 2003) (citation omitted).

In addition, the APA does not require "that every agency action representing a policy change must be justified by reasons more substantial than those required to adopt a policy in the first instance." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Instead, "a policy change complies with the APA if the agency (1) displays 'awareness that it is changing position,' (2) shows that 'the new policy is permissible under the statute,' (3) 'believes' the new policy is better, and (4) provides 'good reasons' for the new policy, which, if the 'new policy rests upon factual findings that contradict those which underlay its prior policy,' must include 'a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy.'" *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (quoting *Fox*, 556 U.S. at 515–16). "[If] the agency ignores or countermands its earlier factual findings without reasoned explanation," it violates the APA. *Fox*, 556 U.S. at 537 (Kennedy, J., concurring).

Here, there is no real dispute that the Repeal complies with three of the four *Fox* requirements. First, BLM displayed "awareness that it is changing position." 556 U.S. at 515.

United States District Court
Northern District of California

14

BLM issued the 2015 Rule, which included many operational requirements for hydraulic fracturing, "as a much-needed complement to existing regulations designed to ensure the environmentally responsible development of oil and gas resources on Federal and Indian lands, which were finalized nearly thirty years ago, in light of the increasing use and complexity of hydraulic fracturing coupled with advanced horizontal drilling technology." 80 Fed. Reg. 16,128. After a change in administrations, BLM rescinded the 2015 Rule in order "to prevent the unnecessarily burdensome and unjustified administrative requirements and compliance costs of the 2015 [R]ule from encumbering oil and gas development on Federal and Indian lands." 82 Fed. Reg. 61,924.  Second, the Repeal returns the regulatory landscape back to BLM's preexisting regulatory regime, which adequately establishes that "the new policy is permissible" under the relevant statutes, FLPMA, IMA, and ILMA.[9]  *Fox*, 556 U.S. at 515.  Third, the Court assumes that

---

[9] California Plaintiffs, unlike Citizen Group Plaintiffs, do not argue that BLM disregarded its statutory duties under the FLPMA, IMA, and ILMA or unlawfully delegated its duties to state and tribal governments through promulgating the Repeal.  *See* Citizen Group Mot. at 18–23.  Although it need not address the argument since Citizen Group Plaintiffs lack standing, the Court notes that even though BLM previously "determined that the collection of information in the rule are [sic] necessary to enable the BLM to meet its statutory obligations," its subsequent decision to repeal the 2015 Rule cannot alone imply that it failed to fulfill its statutory obligations or ran afoul of the APA. 80 Fed. Reg. at 16,154.  BLM's statement regarding statutory obligations was not a factual finding, such that it must explain its change in position.  Instead, BLM's statement of authority does not bind it to a certain course of action: an agency may reconsider its own regulations, "since the power to decide in the first instance carries with it the power to reconsider." *Nat'l Res. Def. Council, Inc. v. United States Dep't of Interior*, 275 F.Supp.2d 1136, 1141 (C.D. Cal. 2002) (quoting *Trujillo v. Gen. Elec. Co.*, 621 F.2d 1084, 1086 (10th Cir. 1980)).  Additionally, the Repeal does not subdelegate BLM's obligations to state and tribal governments.  Instead, it simply removes discretionary federal regulation and returns the regulatory landscape back to what it was prior to promulgation of the 2015 Rule.  It does not explicitly require states and tribal governments to pass regulations or monitor mining operations beyond their own roles; it just points to the present existence of these regulations as a justification for its decision.  And even if the Repeal could be considered a delegation, "[l]imitations on delegation are 'less stringent in cases where the entity exercising the delegated authority itself possesses independent authority over the subject matter.'" *Assiniboine & Sioux Tribes of Fort Peck Indian Reservation v. Bd. of Oil & Gas Conservation of State of Montana*, 792 F.2d 782, 795 (9th Cir. 1986) (quoting *United States v. Mazurie*, 419 U.S. 544, 556–57 (1975).  Here, as thoroughly discussed by all parties, states and tribal governments play a role in the regulation of hydraulic fracturing.  The MLA specifically contemplates the role of state regulations.  *See e.g.*, 30 U.S.C. § 187 (requiring that federal lease provisions may not "be in conflict with the laws of the State in which the leased property is situated.").

United States District Court
Northern District of California

1    BLM "believes" the new policy is better because it decided to implement it.  *Id.*

2          It is BLM's compliance with the remaining *Fox* requirement that is in dispute in this case.

3    California Plaintiffs argue that BLM failed to offer a reasoned explanation for reversing its

4    position, and that its proffered reasons for the Repeal run counter to the evidence before the

5    agency.  California Mot. at 14–18, 21–25.  Specifically, they contend that (1) BLM's rationale that

6    the 2015 Rule was duplicative of state and tribal regulations was negated by BLM when

7    considering the same evidence during the 2015 rulemaking process; and (2) BLM's cost and

8    benefit considerations ignored many of the benefits identified in 2015 and failed to explain why

9    costs previously identified as "minimal" now exceed the 2015 Rule's benefits.  The Court

10   addresses each argument in turn.

11          i.     **"Duplicative" of State and Tribal Regulations**

12          In the Repeal, BLM explained that because "an additional 12 states have introduced laws

13   or regulations addressing hydraulic fracturing," the landscape has changed since it implemented

14   the 2015 Rule.  82 Fed. Reg. at 61,925.  "As a result, all 32 states with Federal oil and gas leases

15   currently have laws or regulations that address hydraulic fracturing operations.  In addition, some

16   tribes with oil and gas resources have also taken steps to regulate oil and gas operations, including

17   hydraulic fracturing, on their lands."  *Id.*  BLM also found that the 2015 Rule's requirement to

18   disclose chemicals was unnecessary since disclosure to FracFocus and state regulatory agencies

19   had increased by 2017.  *Id.* at 61,925–26.  BLM also pointed to updated API industry guidance

20   that provides safety and environmental protections for hydraulic fracturing, while disclosing in its

21   Regulatory Impact Analysis ("RIA") that it "has no data to support an estimate of the percentage

22   of operators that voluntarily comply with the API recommendations when not required by State,

23   Federal, or tribal regulations."  HFRR_000421–500 (RIA) at 28, 31.  Finally, BLM noted that

24   existing BLM regulations adequately ensured that oil and gas operations are conducted in an

25   environmentally sound manner.  82 Fed. Reg. at 61,926.  California Plaintiffs argue that these

26   explanations fall short of the reasoning required to explain how state and tribal regulations, along

27   with preexisting BLM regulations, will "ensure the environmentally responsible development of

28   oil and gas resources," in light of previous concerns that preexisting BLM regulations were "in

16

need of revision as extraction technology has advanced," and that state regulations remained inconsistent.  California Mot. at 15 (quoting 80 Fed. Reg. at 16,128, 16,137).

California Plaintiffs accurately point out that BLM originally stated that the 2015 Rule added necessary improvements to existing BLM regulations, but now articulates a different conclusion.  *Compare* 80 Fed. Reg. at 16,137 ("The [2015 Rule] will complement these existing rules by providing further assurance of wellbore integrity, requiring with limited exception public disclosure of chemicals used in hydraulic fracturing, and ensuring safe management of recovered fluids") *with* 82 Fed. Reg. at 61,926 ("The BLM now believes that the appropriate framework for mitigating [hydraulic fracturing] impacts exists through state regulations, through tribal exercise of sovereignty, and through BLM's own pre-existing regulations and authorities (pre-2015 rule 43 CFR subpart 3162 and Onshore Orders 1, 2, and 7).").  Significantly, however, BLM's focus is not solely on preexisting BLM regulations: the Agency also pointed to additional state and tribal regulations to explain its change in position.  BLM's analysis determined that it:

> currently has authorized oil and gas leases in the following 32 states: Alabama, Alaska, Arizona, Arkansas, California, Colorado, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Montana, Nebraska, Nevada, New Mexico, New York, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, South Dakota, Tennessee, Texas, Utah, Virginia, West Virginia, and Wyoming.
>
> • The following twenty of these states had laws or regulations to address hydraulic fracturing operations prior to the BLM's issuance of the 2015 final rule. Those states included the following: Alaska, Arizona, Arkansas, Colorado, Illinois, Indiana, Kansas, Michigan, Montana, Nevada, New Mexico, New York (prohibited "high volume" hydraulic fracturing in 2015), North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Texas, Utah, and Wyoming.
>
> • Twelve other states have either updated or finalized their laws and/or regulations addressing hydraulic fracturing operations after March 2015. These states are Alabama, California, Idaho, Kentucky, Louisiana, Maryland (bans hydraulic fracturing), Mississippi, Nebraska, South Dakota, Tennessee, Virginia, and West Virginia.
>
> As a result, all 32 of the aforementioned 32 states with existing Federal oil and gas leases currently have laws and/or regulations in place to address hydraulic fracturing (HF) operations.

HFRR_000140–194 (Environmental Assessment or "EA") at 41.  Because BLM relies on the

United States District Court
Northern District of California

1   combination of preexisting BLM regulations and additional state and tribal regulations to explain

2   its change in position, the Court must consider them together.

3       California Plaintiffs argue that referencing these additional state regulations does not

4   provide a reasoned explanation because "the state requirements differ significantly from the

5   [2015] Rule, especially with regard to mechanical integrity testing, pressure monitoring during

6   hydraulic fracturing operations, and post-fracturing disclosure requirements."  California Mot. at

7   16 (citing EA at 41–46).  But providing a reasoned explanation does not require BLM to attest that

8   the additional state and tribal regulations completely fill the exact same regulatory gaps as would

9   the 2015 Rule.  *See Fox*, 556 U.S. at 515 (an agency "need not demonstrate to a court's

10  satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it

11  suffices that the new policy is permissible under the statute, that there are good reasons for it, and

12  that the agency *believes* it to be better, which the conscious change of course adequately

13  indicates.") (emphasis in original).  BLM explained that as of 2017, additional state regulations

14  provided some, though not all, of the same protections imposed by the 2015 Rule.  EA at 43–46.

15  For example, BLM noted that nearly all states under review required chemical disclosure of

16  hydraulic fracturing fluids and the majority had intermediate well casing requirements, even

17  though only a minority imposed cement monitoring requirements.  EA at 43; *see also* RIA 37–41.

18      California Plaintiffs also argue that BLM failed to account for the regulatory shortcomings

19  in tribal regulations, especially regarding water quality concerns.  California Mot. at 17.  While the

20  Court agrees with California Plaintiffs that the same level of detail is not provided for the

21  purported additional tribal regulations, the Court finds that BLM adequately detailed its analysis:

22          Some tribes with oil and gas resources have also taken steps to
            regulate oil and gas development operations, including hydraulic
23          fracturing, on their lands. The Department of the Interior encourages
            tribes to exercise their sovereignty over their lands and mineral
24          resources and to be actively involved in ensuring that oil and gas
            development on their lands is conducted in a safe and environmentally
25          responsible manner.
            Although the states with existing Federal oil and gas leases have
26          regulatory programs addressing hydraulic fracturing operations, the
            oil and gas producing Indian tribes have not as uniformly promulgated
27          regulatory programs to address hydraulic fracturing. In light of this,
            the BLM consulted with Indian tribes and solicited comments
28          regarding existing and proposed tribal regulation of hydraulic

United States District Court
Northern District of California

1       fracturing, and the potential effects of rescinding the 2015 final rule
        on tribes, individual allottees, and Indian resources.

2    EA 10–11.

3           Additionally, BLM provided requirement-by-requirement explanations for the removal of

4    the 2015 Rule requirements. *See* RIA 43–49. Regarding water quality concerns, BLM explained

5    that preexisting BLM regulations had similar or the same requirements (for example, Onshore

6    Order 2 still requires remedial action in the event of inadequate cementing even if documenting

7    the issue is no longer required, and still requires isolation of all usable water), and that industry-

8    recommended practices require many of the well protections detailed by the 2015 Rule (for

9    example the mechanical integrity test and cement evaluation logs to demonstrate isolation). *Id.*

10          It is important to pause here to repeat what the Court is, and is not, tasked with doing under

11   the controlling law. The Court's task is not to decide whether the changes the Federal Defendants

12   seek to make will result in better or worse environmental policy. Those policy questions are the

13   province of Congress and the administrative agencies, and policy changes inevitably result when

14   new decisionmakers take office. In other words, "[e]lections have policy consequences."

15   *Organized Vill. of Kake*, 795 F.3d at 968. The Court's job also is not to decide whether it would

16   find the rationales advanced by the agency compelling (or even persuasive) if it were reviewing

17   the matter from scratch. Instead, the narrow question for the Court is whether the admitted policy

18   change represented by the Repeal was so inadequately explained as to be arbitrary and capricious.

19   *See Nat'l Med. Enterprises, Inc. v. Sullivan*, 957 F.2d 664, 669 (9th Cir. 1992) ("It is not [the

20   Court's] function to second-guess the agency that Congress has charged with administering a

21   statute merely because a party that has lost a particular round of administrative policymaking

22   would prefer a return to the previous rule, or because the policy arguments rejected by the

23   Secretary strike [the Court] as more persuasive").

24          Having reviewed the record in light of these principles, the Court finds that BLM

25   adequately articulated a reasoned explanation for its change in position regarding the sufficiency

26   of BLM's preexisting regulations and state and tribal regulations for hydraulic fracturing. Given

27   this narrow scope of review, the Court thus cannot conclude that BLM's reasoning was contrary to

28   the evidence presented or that the evidence compels a different result. *See Pac. Coast Fed'n*, 265

United States District Court
Northern District of California

1   F.3d at 1034.

2     **ii.**  **Cost/Benefit Calculus**

3     California Plaintiffs also argue that BLM arbitrarily ignored the foregone benefits of the

4   2015 Rule when weighing the costs and benefits of the Repeal.  California Mot. at 21–24.  BLM

5   estimated that the Repeal accounted for an "estimated per-well reduction in compliance costs [of]

6   about 0.1–0.2% of the cost of drilling a well."  RIA at 4.  BLM also reasoned that "[w]hile the

7   extent of the benefits that the additional assurances might provide are questionable, it follows that

8   the rescission of the 2015 rule could potentially reduce any such assurances."  82 Fed. Reg. at

9   61,925.  "After examining [the 2015 Rule], and the potential cost savings and foregone benefits,

10  [BLM] conclude[d] that the cost savings would exceed the forgone benefits."  RIA at 56.

11  California Plaintiffs argue that while BLM acknowledged that the Repeal would result in forgone

12  benefits, *see* 82 Fed. Reg. at 61,925, the Agency failed to seriously consider or discuss any of

13  these benefits in its analysis.  California Plaintiffs point to two previously identified benefits: (1)

14  the 2015 Rule provided the benefit of "a consistent, predictable, regulatory framework," 80 Fed.

15  Reg. at 16, 128, while in the Repeal, BLM failed to consider disparities in state and tribal

16  regulations; and (2) the 2015 Rule highlighted the environmental benefits of the rule, while in the

17  Repeal BLM concluded that the environmental benefits were unlikely to be affected by the Repeal

18  "because of the rarity of adverse environmental impacts," even though it had rejected that

19  argument in 2015.  California Mot. at 21–22.

20    As discussed above, BLM explained that additional state regulations supported its decision

21  to rescind the 2015 Rule.  In its analysis, BLM included state-by-state detail about whether state

22  regulations covered various provisions added by the 2015 Rule.  RIA at 37–41.  BLM further

23  included an explanation for the removal of each provision, indicating whether state regulations,

24  existing BLM regulations, and/or industry guidance otherwise provided similar protections.  *Id.* at

25  43–49. While California Plaintiffs are correct that BLM did not explicitly point to consistency in

26  nationwide regulation as a foregone benefit, *see* RIA at 54, the Court finds that the Agency

27  inherently considered this benefit in its analysis.  A state-by-state analysis fundamentally implies

28  an understanding that each state's regime must be considered due to differing or unique

1   regulations.  It further recognizes that the removal of an overarching regulation results in different

2   protections at the state and tribal levels.  BLM simply made a policy judgment not to prioritize

3   consistency over the additional costs of such measures.  The Court may "not question that the

4   [BLM] was entitled in [2017] to give more weight to socioeconomic concerns than it had in

5   [2015], even on precisely the same record.  '*Fox* makes clear that this kind of reevaluation is well

6   within an agency's discretion.'"  *Organized Vill. of Kake*, 795 F.3d at 968 (quoting *Nat'l Ass'n of*

7   *Home Builders v. EPA*, 682 F.3d 1032, 1038 (D.C. Cir. 2012)).  Here, BLM explained how the

8   record differed from the one that existed when the Agency prepared the 2015 Rule, due primarily

9   to the existence of additional state and tribal regulations.  This explanation sufficiently considers

10  the foregone benefit of nationwide consistency.

11          BLM also addressed foregone environmental benefits, including those impacting water

12  quality, when concluding that the environmental benefits highlighted by the 2015 Rule were

13  unlikely to be affected by the Repeal.  Although BLM noted when promulgating the 2015 Rule

14  that "[t]he need to assure that hydraulic fracturing fluids are isolated from surface waters, usable

15  groundwater, and other wells is clear," 80 Fed. Reg. 16,180, it later explained its view as to why

16  the 2015 Rule was not necessary to ensure such isolation:

> The BLM initiated the development of the hydraulic fracturing rule
> in 2010 in response to public concerns. Relatively few states had any
> regulations on hydraulic fracturing at that time. In light of this, a BLM
> regulation covering wellbore integrity and usable water protection
> seemed appropriate at that time. Since promulgation of the 2015 rule,
> however, many states have updated their regulations to address
> hydraulic fracturing operations. The BLM now believes that the 2015
> rule is duplicative of the states' and some tribal regulations, as well
> as some of the BLM's own pre-existing regulations and authorities
> (pre-2015 rule 43 CFR subpart 3162 and Onshore Orders 1, 2, and 7),
> and is not necessary.

23  82 Fed. Reg. 61,931.  As noted above, BLM's preexisting regulations included some regulations

24  relevant to water protection, as did additional state and tribal regulations and updated industry

25  guidance.  BLM further pointed to "the rarity of adverse environmental impacts that occurred from

26  hydraulic fracturing operations before the 2015 [R]ule, and after its promulgation while the 2015

27  [R]ule was not in effect."  *Id.*  While California Plaintiffs argue that the administrative record

28  contains evidence contrary to the Agency's position, the record also contains evidence consistent

United States District Court
Northern District of California

1   with the Agency's position.  *Compare* HFRR_078908–34 (noting major undesirable events that

2   occurred in 2015 and 2016, while representing that the majority did not involve hydraulic

3   fracturing operations) *with* HFRR_077398–99 (finding that oil field spills records decreased 17%

4   in 2016 compared to the previous year); EA at 18 (finding water impact incidents "were rare and

5   not widespread.").  The Court cannot conclude that this evidence in its totality compels a different

6   outcome than BLM reached, which is the applicable standard.

7           Finally, BLM pointed to site-specific measures, which also provide environmental

8   protections, when unique cases are presented.  For instance, in response to comments concerning

9   well construction, BLM noted that where "geological fractures and fissures" are present, it

10  "impose[s] site-specific protective measures that can be applied when necessary to reduce the risks

11  associated with hydraulic fracturing."  82 Fed. Reg. at 61,932.  BLM thus adequately explained

12  the basis for its conclusion that these benefits would continue without the 2015 Rule, given other

13  regulations and industry practices as well as measures implemented on a site-specific basis.

14          As California Plaintiffs note, BLM acknowledged when implementing the Repeal that the

15  costs for compliance with the 2015 Rule decreased.  BLM identified the same 0.1-0.2% cost,

16  which it classified as "minimal" when promulgating the 2015 Rule.  *See* HFRR_024272–390

17  ("2015 RIA") at 82.  BLM estimated that the Repeal would result in a "reduction in compliance

18  costs relative to the 2015 rule of up to $9,690 per well or approximately $14 million to $34 million

19  per year."  82 Fed. Reg. at 61,925.  In 2015, however, BLM estimated that the "the compliance

20  cost will be about $11,400 per well, or about $32 million per year."  80 Fed. Reg. at 16,130.

21          Still, notwithstanding this overall decrease in the estimated cost of complying with the

22  2015 Rule, BLM prioritized overall cost reduction when weighing the costs and benefits of the

23  Repeal.  As noted above, this was a policy judgment, and it was "well within [the] agency's

24  discretion" to give more weight to socioeconomic costs than it had previously given.  *Nat'l Ass'n*

25  *of Home Builders*, 682 F.3d at 1038.  BLM also outlined the time savings associated with the

26  Repeal, explaining that "the 2015 Rule would have required an additional eight hours of industry

27  time to submit and four hours of BLM time to process applications to conduct fracturing

28  operations and an additional nine hours of industry time to submit and 4.5 hours of BLM time to

United States District Court
Northern District of California

1   process notices after fracturing operations were complete." BLM Mot. at 39 (citing RIA 43–44).

2   Considering the totality of the Agency's cost-benefit analysis, the record does not compel the

3   conclusion that BLM arbitrarily ignored foregone benefits or arbitrarily overvalued the costs

4   associated with the 2015 Rule, as California Plaintiffs urge.

5        In summary, BLM met the requirement of providing a "reasoned explanation" for why it is

6   changing course after the nearly five-year long extensive rulemaking that resulted in the 2015

7   Rule. Although BLM could have provided more detail, it did enough to clear the low bar of

8   arbitrary and capricious review, and that is all the law requires.[10]

9        **iii.   Wyoming's Counter-Argument**

10        Wyoming and the Associations additionally respond to Plaintiffs' motions for summary

11   judgment by arguing that BLM lacked authority to promulgate the 2015 Rule in the first place,

12   thus justifying the Repeal. Wyoming Mot. at 10–17; Associations Mot. at 24–30. This argument

13   relies almost entirely on the previous litigation brought by Wyoming after promulgation of the

14   2015 Rule. *See Wyoming v. United States Dep't of the Interior*, No. 15-CV-43-S (D. Wyo. March

15   25, 2015). The 2015 Rule is not before the Court, however. Further, contrary to Wyoming's

16   statements, BLM did not "recognize[] that it lacked the authority to promulgate the 2015 Rule."

17   Wyoming Mot. at 10. Instead, BLM found "that it [was] not only better policy to rescind the 2015

18   rule to relieve operators of duplicative, unnecessary, costly and unproductive regulatory burdens,

19   but it also eliminate[d] the need for further litigation about BLM's statutory authority." 82 Fed.

20   Reg. at 61,925 (noting also that "[c]ommenters and a District Court have raised doubts about

21   BLM's statutory authority to regulate hydraulic fracturing operations on Federal and Indian

22   lands"). In other words, BLM did not concede or find that it lacks legal authority. It simply

23

24       [10] California Plaintiffs also argue that the Repeal violates the APA because BLM failed to consider

25   available alternatives. California Mot. at 20–21. While BLM must consider alternatives, "[a] court is not to ask whether a regulatory decision . . . is better than the alternatives." *F.E.R.C. v.*

26   *Elec. Power Supply Ass'n*, 136 S. Ct. 760, 782 (2016), *as revised* (Jan. 28, 2016). Here, BLM explored four separate alternatives: (a) no action, (b) rescind the 2015 Rule, (c) rescind the 2015

27   Rule and amend the previous regulations to remove the approval requirements for "nonroutine" operations, and (d) rescind the 2015 Rule except for the chemical disclosure requirement. EA at 3.

28   This is sufficient: there is nothing in the APA that requires an endless consideration of alternatives.

1  acknowledged the underlying litigation in its cost and benefit calculus.  The Court thus need not

2  determine whether BLM had the statutory authority to promulgate the 2015 Rule, as that issue is

3  not properly before it.

4      In summary, because BLM provided an adequate explanation for its change in position in

5  rescinding the 2015 Rule, the Court **GRANTS** Federal Defendants' motion for summary judgment

6  and **DENIES** California Plaintiffs' motion for summary judgment as to the APA claim.[11]

7      **C.**    **NEPA Claim**

8      Plaintiffs argue that BLM violated NEPA when publishing the Repeal because it failed to

9  take a "hard look" at the Repeal's impact and failed to prepare an EIS.  California Mot. at 25–28;

10  Citizen Group Mot. at 31–40.  "The purpose of NEPA is to require disclosure of relevant

11  environmental considerations that were given a 'hard look' by the agency." *Lands Council v.*

12  *Powell*, 395 F.3d 989, 993 (9th Cir. 2004).  Under NEPA, federal agencies must assess the

13  environmental impact of agency actions that "significantly affect[ ] the quality of the human

14  environment."  42 U.S.C. § 4332(C).  Where an agency's project "might significantly affect

15  environmental quality," NEPA compels preparation of an EIS.  *See WildEarth Guardians v.*

16  *Provencio*, 923 F.3d 655, 669 (9th Cir. 2019).  "Significance exists if it is reasonable to anticipate

17  a cumulatively significant impact on the environment.  Significance cannot be avoided by terming

18  an action temporary or by breaking it down into small component parts."  40 C.F.R.

19  § 1508.27(b)(7).

20      Plaintiffs argue that BLM failed to take a "hard look" at the environmental consequences

21  of repealing the 2015 Rule, including the impact of using waste pits instead of tanks and impacts

22  on tribal lands generally.  *See* California Mot. at 25–28, Citizen Group Reply at 23–25.  BLM

23  previously reported environmental benefits from the use of tanks to store hydraulic fracturing

24  wastes instead of pits.  *See* 80 Fed. Reg. at 16,162 ("the above-ground tanks, when compared to

25  pits, are less prone to leaking, are safer for wildlife, and will have less air emissions").  Plaintiffs

26

27  _____

28  [11] The Court also **GRANTS** Wyoming's, API's and the Association's motions for summary judgment, while rejecting Wyoming's and the Association's argument that summary judgment is appropriate on the basis that BLM lacked authority to promulgate the 2015 Rule.

United States District Court
Northern District of California

argue that any action to rescind these benefits required a "hard look" and an EIS, because it could significantly affect the environment.

BLM primarily responds that it was not required to conduct a NEPA analysis because the Repeal rescinded a rule that had never gone into effect. BLM Mot. at 42–43. The Ninth Circuit has held that "NEPA procedures do not apply to federal actions that maintain the environmental status quo." *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1114 (9th Cir. 2002), *abrogated on other grounds by Wilderness Soc. v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011). While BLM is correct that the 2015 Rule never went into effect, the cases in which the "status quo" principle has been discussed involved circumstances different than the unique ones this case presents. *See Kootenai Tribe*, 313 F.3d at 1114 (finding that the environmental status quo was not maintained since "the reduction in human intervention that would result from [challenged action] actually does alter the environmental status quo"); *see also Burbank Anti–Noise Group v. Goldschmidt*, 623 F.2d 115, 116–17 (9th Cir. 1981) (NEPA did not apply when an agency financed the purchase of an already-built airport); *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343–1344 (9th Cir. 1995) (NEPA did not apply when agency transferred title to wetlands already used for grazing); *Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1446 (9th Cir. 1996) (closure of bicycle trails did not trigger an EIS).

That said, the principle facially applies to the facts of this case. Because enactment of the 2015 Rule was enjoined before it ever went into effect, its "benefits" and "protections" remained hypothetical and unrealized at the time the Repeal was promulgated. Oil and gas operations on BLM lands have been regulated only by a combination of preexisting regulations and state and tribal regulations since the 1980s. Conducting an EIS would have been difficult where data about the environmental impacts of the 2015 Rule would be as hypothetical as data about the Repeal. Instead, the environmental status quo never changed.

In support of their position, Plaintiffs cite *California ex rel. Lockyer v. U.S. Dep't of Agric.*, in which the Ninth Circuit rejected a similar argument by the Department of Agriculture. 575 F.3d 999, 1015 (9th Cir. 2009) (finding that an effective repeal of a regulation subject to an injunction "was taking substantial environmental protections off the books"). There, the court

found the agency's "self-serving argument le[ft] too much to the vicissitudes of the timing of the litigation," since the injunction was still pending review in the Tenth Circuit at the time of the agency's action.  *Id.* at 1016.  But the Court sees a significant distinction between this case and *Lockyer*: there, the regulation at issue was in effect for seven months prior to the injunction, as specifically noted by the Ninth Circuit:

> The Roadless Rule was legally valid for the seven months after the opinion in *Kootenai Tribe*.  From the time our mandate issued to when the United States District Court for the District of Wyoming issued its injunction, the Roadless Rule governed the roadless area management of the national forests.  The USDA asserts that the period between injunctions 'was insufficient to make any meaningful difference in forest planning.  This is so because . . . development activities . . . require many months or years to plan, evaluate, and implement.'  This argument misses the mark.  That the Roadless Rule did not interfere with forest planning measures does not mean that the months of limited human intervention it facilitated were without beneficial effect on roadless areas and their complex ecosystems.

575 F.3d at 1014 (emphasis removed).

Without dispute, the 2015 Rule was *never* in effect in this case, and the Tenth Circuit declined to reach the merits of the injunction based on BLM's intention to rescind that rule.  So the Court cannot find that the Repeal significantly impacted the environment.  Instead, both before and after the Repeal, the environmental impact of hydraulic fracturing has remained consistent, and has been regulated only by BLM's preexisting regulations, as well as by state and tribal regulations.  *See Wyoming*, 871 F.3d at 1143 (explaining that "the continued operation of oil and gas development on federal lands . . . represents no departure from the status quo since 2015").  The Court therefore agrees with Federal Defendants that NEPA does not apply here, where the environmental status quo was not altered by the Repeal.[12]

---

[12]  The Court believes that the *Lockyer* court's reliance on the actual implementation of the Roadless Rule in support of its holding compels the conclusion that NEPA does not apply here, because the 2015 Rule was never implemented.  But it acknowledges that this result raises a concern that an incoming administration might simply set aside the outgoing administration's regulations that are not yet in place, potentially defeating NEPA's purpose.  *Cf. Lockyer*, 575 F.3d at 1014 n.9 (noting a similar concern with the Government's argument that a regulation was not "in place long enough to make a meaningful difference").  Nonetheless, for the reasons discussed above, the Court reads *Lockyer* to mandate the conclusion that the Repeal did not change the

United States District Court
Northern District of California

1    Because NEPA does not apply given these unusual facts, the Court **GRANTS** Federal

2    Defendants', Wyoming's, and API's motions for summary judgment and **DENIES** Plaintiffs'

3    motions for summary judgment as to the NEPA claims.

4    ### D.    ESA Claim

5    Finally, Citizen Group Plaintiffs argue that BLM violated the ESA by failing to consult

6    with FWS prior to taking any action that "may affect" a threatened or endangered species.  Citizen

7    Group Mot. at 25–30 (quoting 16 U.S.C. § 1536(a)(4)).  "In order to ensure compliance with the

8    [ESA], . . . agencies [must] consult with the appropriate federal fish and wildlife agency . . .

9    whenever their actions 'may affect' an endangered or threatened species."  *Pac. Rivers Council v.*

10   *Thomas*, 30 F.3d 1050, 1054 n.8 (9th Cir. 1994) (citing 50 C.F.R. § 402.14(a)).  A federal agency

11   "must initiate formal consultation if its proposed action 'may affect' listed species or critical

12   habitat," and "[a]ny possible effect, whether beneficial, benign, adverse, or of an undetermined

13   character, triggers the formal consultation requirement."  51 Fed. Reg. at 19,949.  However, "if the

14   agency determines that a particular action will have no effect on an endangered or threatened

15   species, the consultation requirements are not triggered."  *Id.*  BLM determined that the Repeal

16   would not affect listed endangered or threatened special because "[n]either the rescinding nor the

17   implementation of the 2015 final rule would, by themselves, authorize or prohibit hydraulic

18   fracturing operations as a whole, or any particular operations on Federal or Indian lands . . .

19   [T]hese actions are also not expected to impact the number of hydraulic fracturing operations.  As

20   such, the actions, would not, by themselves, have an effect on any listed species or its habitat . . ."

21   82 Fed. Reg. 61,941.  Thus, BLM responds that it was not required to consult with FWS, or

22   prepare a biological assessment, and notes that it did not do so when promulgating the 2015 Rule.

23   BLM Mot. at 50.

24   "To determine whether the BLM's no effect determination was arbitrary and capricious,

25   [the Court] must decide whether the BLM 'considered the relevant factors and articulated a

26   rational connection between the facts found and the choice made.'"  *Kraayenbrink*, 632 F.3d at

27   _____

28   environmental status quo (even if it prospectively altered the regulatory landscape in the wake of
     the Tenth Circuit's ruling).

United States District Court
Northern District of California

United States District Court
Northern District of California

496 (quoting *Nat'l Ass'n of Home Builders*, 340 F.3d at 841).  Here, BLM explained that it "already had an extensive process in place to ensure that operators conduct oil and gas operations in an environmentally sound manner."  82 Fed. Reg. at 61,925.  It further explained that "BLM also possesses discretionary authority allowing it to impose site-specific protective measures reducing the risks associated with hydraulic fracturing," *id.* at 61,926, and that "site-specific proposals to drill for and develop oil and gas resources that involve hydraulic fracturing operations would require the same level of compliance with the ESA and [the National Register of Historic Places] if the BLM did not rescind the 2015 rule," *id.* at 61,941.  BLM contends, as it did with respect to Plaintiff's NEPA allegations, that the Repeal maintained the environmental status quo on BLM lands such that there would be no effect on threatened species or their habitats from the Repeal.  BLM Mot. at 51.  Instead, BLM already had protections in place for threatened species through site specific measures on lands open for oil and gas development and the Repeal did not open any additional lands previously lacking protections.  The Court agrees that BLM provided a rational connection between its choice to repeal the 2015 Rule and the fact that BLM lands open to oil and gas development already employed site-specific protections where needed.[13]

Citizen Group Plaintiffs similarly argue that *Lockyer* compels a different result.  Citizen Group Reply at 18.  However, *Lockyer* does not apply to Citizen Group Plaintiffs' ESA claim. BLM's rationale is that both the 2015 Rule and the Repeal have no effect on threatened wildlife protected by the ESA because "these actions are [] not expected to impact the number of hydraulic fracturing operations."  82 Fed. Reg. 61,941.  Instead, site-specific measures provided protection to threatened species even under its preexisting regulations, such that the Repeal would not affect these operations.  While Citizen Group Plaintiffs argue that the Repeal removed environmental protections threatening species, the Repeal did not affect any of the ESA protections that had been

---

[13] Federal Defendants argue that because BLM failed to consult with FWS when implementing the 2015 Rule, that rule suffers from the same defect (if any) as the Repeal and thus cannot be implemented.  BLM Reply at 22.  This, however, concerns what remedy is appropriate after finding a procedural violation of the ESA, and has no bearing on whether there was a procedural violation in the first place.  *See Crickon v. Thomas*, 579 F.3d 978, 988 (9th Cir. 2009) ("Because the interim rules in this case suffer from the same defect as the final rule—lack of articulation of the agency's rationale—we similarly decline to reinstate them.").  Because the Court finds no procedural violation, it need not address any remedy arguments.

1    in place through site-specific analyses.  Citizen Group Plaintiffs also place great weight on the

2    statement "Looks like we'll need to do a biological assessment for this rule," made by BLM

3    official James Tichenor, in an email exchange that occurred while the Agency researched the

4    Repeal.  HFRR_2202.  But this is not a statement by the Agency and does not provide any sort of

5    dispositive evidence regarding this claim.  Instead, the Court must review the entire administrative

6    record, with a particular focus on the final representations BLM provided in the Repeal.  BLM's

7    final position was that the Repeal would have no effect on threatened species on BLM lands, and

8    the Court finds that there is a rational connection between this position and facts presented in the

9    record.

10        Even though "[t]he minimum threshold for an agency action to trigger consultation with

11   FWS is low," BLM's conclusion that the Repeal has no effect to threatened species was not

12   arbitrary and capricious in light of the totality of the record.  *Kraayenbrink*, 632 F.3d at 496.

13   Accordingly, the Court **GRANTS** Federal Defendant's and Wyoming's motion for summary

14   judgment as to this claim and **DENIES** Citizen Group Plaintiffs' motion.[14]

15        //

16        //

17        //

18        //

19        //

20        //

21        //

22        //

23        //

24        //

25        //

26

27   [14] The evidence outside of the administrative record upon which Citizen Group Plaintiffs rely does
     not change the Court's conclusion.  Thus, the Court need not reach the parties' dispute regarding
28   evidence outside of the administrative record.  BLM Mot. at 52–56; Citizen Group Reply at 19–
     23.

United States District Court
Northern District of California

## IV.   CONCLUSION

For the reasons provided above, the Court **GRANTS** Federal Defendants' motion for summary judgment, Case No. 4:18-cv-00521, Dkt. No. 116; Case No. 4:18-cv-00524, Dkt. No. 126, and **DENIES** Plaintiffs' motions for summary judgment, Case No. 4:18-cv-00521, Dkt. No. 112; Case No. 4:18-cv-00524, Dkt. No. 110.  Limited to the reasoning provided in this Order, the Court also **GRANTS** Wyoming's, API's, and the Associations' motions, Case No. 4:18-cv-00521, Dkt. No. 119, 120, 121; Case No. 18-cv-0524, Dkt. Nos. 129, 130, 131.[15]

The Court further directs the parties to file an agreed-upon proposed form of judgment in accordance with this order within 14 days.

**IT IS SO ORDERED.**

Dated:   3/27/2020

HAYWOOD S. GILLIAM, JR.
United States District Judge

---

[15] Also pending is the Institute for Policy Integrity at New York University School of Law's motion for leave to file an amicus curiae brief.  Case. No. 4:18-cv-00524, Dkt. No. 111.  "It is well-settled that a trial court may, in the exercise of its discretion, permit the filing of an amicus curiae brief."  *Warehouse Rest., Inc. v. Customs House Rest., Inc.*, No. C-80-3054, 1982 WL 63800, at *1 (N.D. Cal. Oct. 4, 1982).  Here, the Institute presents unique arguments regarding the cost and benefit analysis in the Repeal.  Accordingly, the Court **GRANTS** leave to file the amicus brief.

United States District Court
Northern District of California